[No. 14672-0-II.   Division Two.   November 24, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. JEFFREY A. OHRT, ET AL, *Appellants.*

*Les Ching,* for appellants (appointed counsel for appeal).

*Patrick D. Sutherland, Prosecuting Attorney,* and *Rodney G. Franzen, Deputy,* for respondent.

PETRICH, J.[*] — Jeffrey Ohrt and Herbert McCray appeal their joint convictions by a Thurston County jury for cus-

---

[*]Judge John A. Petrich was a member of the Court of Appeals at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

todial interference in the first degree. They contend that the State failed to prove an element of the crime, *i.e.*, that McCray, with Ohrt's assistance, took McCray's child away from a person (the child's mother) who had a "lawful right to physical custody" of the child. *See* RCW 9A.40.060(1). We disagree with defendants and affirm their convictions.

Herbert Glenn McCray and Dixie Darst lived together in Olympia, Washington, from 1982 until 1990. The couple had two children: a boy, Casey, born in 1983, and a girl, Hayden, born in 1987. McCray and Darst never legally married. However, just before Casey was born, Darst signed a marriage contract McCray had drafted so that his insurance company would pay for Casey's birth. McCray filed this contract with the Thurston County Auditor. There is no dispute that McCray is Casey's father.

Darst left McCray in April of 1990, taking the children with her. In July of that year, Darst instituted paternity proceedings against McCray. As part of those proceedings, Darst's attorney obtained and filed three successive orders in Thurston County Superior Court, each identically captioned: "Temporary Restraining Order, Order Adopting Temporary Parenting Plan, Order for Appointment of Guardian Ad Litem, and Order to Show Cause." The first order was entered on July 27, 1990, but was not served on McCray. A second order, entered on August 9, was also never served. The court entered its third and final order on August 28. McCray managed to avoid service of this order as well. He never appeared at any of the show cause hearings. All three orders adopted a temporary parenting plan giving child custody to Darst, and all restrained McCray from removing the children from Darst and from going to Darst's "premises or place of employment", on penalty of criminal prosecution for violation of the order.[1]

---

[1] RCW 26.09.300(1), part of the marriage dissolution act, makes it a misdemeanor to violate a restraining order "issued under this chapter". The defendants were not charged under that statute, however, but with the class C felony of custodial interference under RCW Title 9A, the criminal code.

At trial, several witnesses testified concerning McCray's knowledge of the restraining orders and his attempts to avoid service. Sheriff's Detective Ware testified that he stopped McCray on August 7, 1990, and told McCray a restraining order had been filed against him. Kristy Wall, the children's baby-sitter, also testified that she told McCray a restraining order had been entered against him. One of McCray's accomplices, Sarah Broom, who testified against McCray in exchange for dismissal of charges against her, stated that McCray told her he had avoided service of "papers" having to do with "outrageous" child support.

The alleged crime was committed on September 26, 1990, when Sarah Broom, a friend of McCray's, drove McCray and his roommate, Jeffrey Ohrt, to Darst's residence. They waited there for Darst to arrive home from work. When Darst drove up to her mailbox to check the mail, Ohrt served her with McCray's temporary parenting plan. In the meantime, Casey had left the car to move a garbage can. As Casey was moving the can, McCray grabbed him. McCray then placed Casey in Broom's car and drove off. They drove directly to Broom's house in Longview, where McCray and Casey transferred to McCray's jeep. McCray then drove Casey to California, where McCray's brother lived.

McCray spent the next few days entertaining his son by taking him to Disneyland and various other recreation spots. San Bernardino County law enforcement authorities arrested McCray on October 10, 1990, and returned him to Washington. McCray and Ohrt were tried jointly and were convicted by a jury as charged.

RCW 9A.40.060(1), the statute under which McCray was charged as a principal and Ohrt was charged as an accomplice, defines custodial interference in the first degree as follows:

> A relative of a child under the age of eighteen or of an incompetent person is guilty of custodial interference in the first degree if, with the intent to deny access to the child or incompetent person by a parent, guardian, institution, agency, or other person having a lawful right to physical custody of such person, the relative takes, entices, retains, detains, or

conceals the child or incompetent person from a parent . . . or other person having a lawful right to physical custody of such person and:

(a) Intends to hold the child or incompetent person permanently or for a protracted period; or

. . . .

(c) Causes the child or incompetent person to be removed from the state of usual residence . . .[.]

RCW 9A.40.010(3) defines the term "relative" to include "an ancestor, descendant, or sibling"; obviously, the word "ancestor" includes a parent. Therefore, a parent can be guilty of the crime charged if he or she takes a child from the other parent, who has a lawful right to custody.

Each parent has an equal right to custody of the children, and the parents, even though they are living apart, share custody in the absence of a court order modifying their rights. *State v. LaCaze*, 95 Wn.2d 760, 763, 630 P.2d 436 (1981). Therefore, as Casey's parents, McCray and Darst began with equal custodial rights. The prosecution's theory in this case was that the temporary orders granting custody of the children to Darst and restraining McCray from contacting her and the children gave Darst a "lawful right" to custody while depriving him of that right, so that McCray and Ohrt were guilty of custodial interference when they drove away with Casey.[2] As we will explain, this theory somewhat misses the

---

[2]The State's brief argues that it does not matter whether a custody order had been entered or whether McCray was aware of such an order, because he was also guilty of custodial interference as defined by subsection (2) of RCW 9A.40.060. Subsection (2) makes it unlawful for a "parent or other person acting under the directions of the parent", to take, entice, retain, or conceal a minor child "from the other parent", where "no lawful custody order has been entered". Thus, this section focuses on a *parent* and not just a "relative", making the parent guilty of custodial interference in the first degree even in the absence of a custody order. We are not concerned with subsection (2) in this case, however, because the defendants were charged and the jury was instructed only on the basis of subsection (1).

The State had an opportunity to move to amend its information to charge custodial interference as committed under subsection (2), that is, by a parent in the absence of a custody order. After resting its case, the defense moved to dismiss, arguing that the State had failed to prove McCray had ever been served with an order curtailing his custodial rights, as supposedly required by subsection (1). The prosecutor replied that because of the alternative means of committing

thrust of the statute. Nevertheless, the convictions should be affirmed.

Defendants moved before trial to dismiss the charges, on the grounds (1) McCray had not been served with the custody orders and, therefore, could not be bound by them; and (2) the temporary restraining orders (TRO's) expired after 14 days by operation of CR 65(b) and were not in effect on September 26, when the alleged abduction took place. The trial judge denied the motion, reasoning that since McCray had actual notice of the orders, service was not necessary to validate them, and that the third such order was in effect until October 2, 1990, the date fixed for a show cause hearing. The parties reiterate these positions on appeal.

The parties' briefs focus mainly on whether the August 28 order, temporarily awarding custody to Dixie Darst and restraining McCray, had legal effect on September 26, 1990, when he snatched Casey from her. McCray argues that he had no legal notice of the order notwithstanding his avoidance of service. He starts with the Uniform Parentage Act, in which RCW 26.26.130(6) authorizes orders adopting parenting plans at a party's request, and RCW 26.26.137(2) authorizes temporary restraining orders where appropriate. According to RCW 26.26.137(5)(b) and (c), such a TRO may be revoked or modified, and it terminates upon entry of the final order determining paternity. McCray then points, however, to CR 65(b)(2), which states that a TRO "shall expire by its terms within such time after entry, not to exceed 14 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period . . .". Putting this court rule and parentage statute together, McCray argues that because the August 28 TRO was not extended pursuant

---

the crime provided in subsection (2), it was irrelevant whether McCray had been served. Report of Proceedings (RP), at 662-67. Defense counsel countered that because his clients had not been charged under subsection (2), the State could not rely on it. RP, at 667-69. Although the prosecutor then reminded the court that he could amend the information "any time up to the verdict and include that particular subsection", RP, at 669, he never moved to amend. Thus, the alternative means of committing the crime did not come before the jury.

to the rule, and was not superseded by a final paternity order, it expired 14 days after its entry, and was no longer in effect when the abduction occurred on September 26.

The trial court ruled that McCray was subject to the TRO because he knew about it, despite having avoided service. McCray urges us to hold that RCW 26.09.300(2), which specifies when a person in a marriage dissolution proceeding is deemed to have notice of a TRO, also applies to a paternity action such as that commenced by Dixie Darst.[3] McCray did not receive any of the forms of notice set forth by that statute, and he contends that no less notice should suffice in the present context.

■ Although we are inclined to agree with McCray that a person subject to prosecution for violation of a TRO is entitled to at least as much notice of the TRO's existence as the indicators contained in RCW 26.09.300(2), the issue is a red herring in this case. The State charged McCray and Ohrt with violating RCW 9A.40.060(1)(a) and (c). Under that statute, reduced to its essentials, the crime of first degree custodial interference is committed when a minor child's "relative" takes the child from a parent or other lawful custodian, with the intent to deny such custodian access to the child, and (1) intends to hold the child permanently or (2) causes the child to be removed from the state of residence. The issue of whether McCray had notice of the TRO obtained by Darst is irrelevant to the crime charged because it does not matter whether or not the taking "relative" has a lawful right to custody. What the crime simply but clearly requires is that the taker be a "relative", here the father, McCray, and that the taker intend to deny another lawful custodian access to the child. Thus, McCray (and his accomplice, Ohrt) could be found guilty even if McCray's presumptive custodial

---

[3]RCW 26.09.300(2) provides that a person is deemed to have notice of a TRO issued under the marriage dissolution act if: (a) The person to be restrained or his attorney signed the order; (b) the order recites that the person or his attorney appeared personally before the court; (c) the order was served upon the person to be restrained; or (d) a peace officer gave the person an oral reading or certified copy of the original order.

rights as the child's father were never abridged by court order.

By the plain terms of RCW 9A.40.060(1), the concept of lawful custodial rights is important only with respect to the custodian who is denied access to the child by the taking. In this case, the State sought to use the TRO to prove that Darst had legal custody as against McCray, who did not. But McCray's custodial right was immaterial to proof of the crime, as we have shown. As for Darst, the TRO would have become significant as a means of proving her "lawful right to physical custody" only if that right had been in doubt. In this case, however, she had a mother's presumptively legal custodial right, which had never been abridged by court order, so the TRO was not needed to establish her custodial status.

The jury was instructed so as to permit it to find that McCray and Ohrt were guilty as charged, without considering the effect of the temporary restraining order. Therefore, the parties' misguided focus on the TRO had no apparent influence on the outcome. McCray raises a number of issues in a pro se supplemental brief. We do not address them, except to state that all of them lack merit.

Affirmed.

SEINFELD, A.C.J., and MORGAN, J., concur.

Review denied at 123 Wn.2d 1029 (1994).