(193 P.3d 483)
No. 97,863

STATE OF KANSAS, *Appellee*, v. GREGORY A. RENFRO, SR., *Appellant*.

Opinion filed October 3, 2008.

*Krystle M. Dalke*, legal intern, and *Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Elizabeth J. Dorsey*, legal intern, *Steven J. Obermeier*, assistant district attorney, *Phill Kline*, district attorney, and *Paul J. Morrison*, attorney general, for appellee.

Before MALONE, P.J., BUSER, J., and LARSON, S.J.

LARSON, J.: In this appeal, Gregory A. Renfro, Sr., challenges his conviction of aggravated interference with parental custody contending there was insufficient evidence to prove the charge and that the conviction violates his fundamental right to be a parent.

With the sufficiency of the evidence in issue, we will set forth the facts in considerable detail which resulted in Renfro's conviction after a jury trial.

Latoya Berry and Renfro are the biological parents of G.R., born April 18, 2003. Berry and Renfro ended their relationship in April 2005 when their child was 2 years old. They were not dating on April 3, 2006. They had never married. There was no written visitation schedule.

Renfro had not had planned visits with the child since the child was 6 months old. Berry testified Renfro called and asked to see the child every 3 months and visited the child at Berry's mother's house. Renfro had "off and on" contact, about twice per month, with the child from the time the parents broke up until April 3, 2006. Berry testified Renfro's sporadic conduct was not due to her denying Renfro visitation.

On April 1, 2006, between 3:30 and 4 a.m., Renfro went to Berry's apartment saying he wanted to see the child. Berry told Renfro it was not a good time. After Berry closed and locked the door, Renfro climbed up to Berry's third-floor balcony and knocked on the window. She testified she was not comfortable with Renfro's presence that night because she had not seen or heard from him for a month and was unsure why Renfro was there at that time in the morning.

Two days later on April 3, 2006, Renfro showed up at Berry's doorway around 9 p.m. Renfro said he wanted to see the child. Berry said it was not a good time as she had not talked with Renfro earlier that day. Berry attempted to close the door, but Renfro pushed it open causing Berry to fall. Berry testified Renfro took her cell phone and then proceeded to play with the child. Berry said she did not call the police when Renfro arrived, nor did she tell him he could not come in or ask him to leave.

Berry testified Renfro told her he wanted to talk in the hallway and Renfro moved toward the door with the child. Berry stated Renfro then ran down the stairs with the child and she ran after him. Berry stated she told Renfro not to take the child and asked Renfro if he came to her apartment to take the child. Berry testified Renfro denied coming to take the child but did not say anything else as he put the child in the front seat of the car without a car seat. Berry stated Renfro got in the car, locked the doors, and left. Berry called the police, but they told her there was nothing they could do because Renfro was the child's father. Berry testified she had safety concerns about Renfro seeing the child because Renfro did not have a permanent residence and stayed at different places. Berry testified she called Renfro numerous times after he took the child and asked when he planned to return the child and where the child was; Renfro would not answer either question.

On April 4, Berry filed for a protection from stalking order because she was worried about her safety and that of the child. Berry stated she unsuccessfully looked for the child that day. She also spoke with Renfro, but he would not tell her the child's location. On April 5, Berry searched for the child and talked to Renfro on the phone; he continued to refuse to disclose the child's location.

Berry testified she called Renfro's relatives who told her they did not know anything, or if Renfro was at their house, he would hang up on Berry.

Berry filed a formal police report with the Shawnee, Kansas, Police Department on April 6. She talked to the child on the phone that day for the first time since Renfro took him. Berry and Renfro spoke on the phone on April 7, but Renfro refused to give Berry the child's location. That day, Berry and her father went to Move Up which printed flyers. They also advertised the missing child on the radio.

A meeting was held between Berry, her parents, and Renfro at the Jackson County Library on April 8. Berry testified Renfro would not tell her where the child was. The meeting ended when Berry's mother began crying; Renfro became upset and said, "I don't need this," and walked out.

Renfro called Berry to arrange another meeting on April 9. Berry testified Renfro told her she could see the child if she came alone. They were supposed to meet at a house in Missouri, but Renfro later called saying the meeting was cancelled because his friend decided they could not meet at his house. Berry did speak to the child on this day.

On April 10, Berry went to the Shawnee Police Department again and spoke with Shawnee Sergeant Carrie Hall who told Berry she could not find the child and was having trouble with the Kansas City, Missouri, police because the child was not in the national database as a missing child. After speaking with Berry, Sergeant Hall reclassified the case as an aggravated interference with parental custody and entered the child in the national database.

Sergeant Hall received a call from Renfro who said he had the child but refused to disclose the location. Sergeant Hall testified that Berry had Renfro's girlfriend's address in Kansas City, Missouri, where police attempted to make contact but no one answered the door.

Berry testified she talked to Renfro on April 11 and asked where the child was but Renfro continued to refuse to disclose the location. The next day, Berry was interviewed by a local TV news channel about the child. After the newscast aired that day, an anony-

mous tip about Renfro's location was received by the police. Police then knocked on the door of a house in Kansas City, Missouri, and Renfro answered the door. The child was there and was returned to Berry.

During the trial, Berry admitted Renfro told her he wanted to spend time with the child and would return the child at some time. She admitted to talking to Renfro but denied that he told her where he and the child were and where they were staying.

Renfro's aunt testified the child and Renfro were at her house at times between April 3 and 12. The aunt said Berry knew where the child was and did not mind Renfro having the child. Berry testified she looked for her child at the aunt's house because he had been found there previously, but he was not there when she checked.

Renfro testified he came to Berry's apartment on April 3 after calling and obtaining permission to come. He denied pushing in the door or pushing Berry to the floor. He admitted taking the child but claimed Berry did not chase him or tell him to stop. He admitted he lied when he told Berry he would not keep the child for very long. Renfro testified he and the child stayed at a different residence each night. He claimed that Berry did not tell him that the police were involved and if he had known, he said he would have returned the child. He said he learned of police involvement on April 10 when he spoke with Sergeant Hall and refused to disclose the child's location.

Renfro admitted he took the child and that he did not give Berry a date that he would return the child. He said he called Berry daily to let her know the child was fine. He testified he wanted to arrange a visitation schedule and did not return the child to Berry because he knew she would not let him see the child on Easter or his birthday. He claimed he did not intend to conceal the child between April 3 and April 12.

Based on the above evidence, Renfro was convicted of aggravated interference with child custody in violation of K.S.A. 21-3422a. After several of Renfro's motions were overruled, he was sentenced to 24 months' probation with an underlying prison sentence of 23 months and the condition that he not have contact with

Berry or the child while at Labette Correctional Conservation Camp (Labette).

Renfro timely appealed.

Renfro's probation was subsequently revoked after he was removed from Labette for disciplinary reasons. He was ordered to serve his original sentence.

Renfro first argues his fundamental right to be a parent is violated by his conviction of aggravated interference with parental custody. He admits he did not assert that his conviction was unconstitutional at his trial but now argues his situation falls under the exceptions the Kansas Supreme Court has recognized for addressing a constitutional claim for the first time on appeal as set forth in *State v. Gonzalez*, 282 Kan. 73, 114, 145 P.3d 18 (2006):

" '(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason.' [Citations omitted.]"

The State correctly points us to the longstanding rule that when constitutional grounds are asserted for the first time on appeal, the issue is not properly before the court on review. *State v. Powell*, 274 Kan. 618, 625, 56 P.3d 189 (2002). However, the right to be a parent is a fundamental right recognized as a liberty interest to be protected by the Due Process Clause. See, *e.g., Troxel v. Granville*, 530 U.S. 57, 65-66, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000); *In re Adoption of Baby Boy L.*, 231 Kan. 199, 221, 643 P.2d 168 (1982). The issue Renfro raises is purely a question of law and is necessary to be considered to prevent the denial of a fundamental right, making it one that justifies our reaching and deciding Renfro's constitutional arguments in this case. The issue raised has not previously been considered by a Kansas appellate court.

Whether a statute is constitutional is a question of law over which appellate courts have unlimited review. *Tolen v. State*, 285 Kan. 672, 673, 176 P.3d 170 (2008). We are further guided by the following rules in considering the constitutionality of a statute:

" 'The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality,

it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond reasonable doubt.' [Citation omitted.]" *State v. White-sell*, 270 Kan. 259, 268, 13 P.3d 887 (2000).

The applicable statutes under which Renfro was convicted are K.S.A. 21-3422 and K.S.A. 21-3422a, which read as follows:

"(a) Interference with parental custody is leading, taking, carrying away, decoying or enticing away any child under the age of 16 years with the intent to detain or conceal such child from its parent, guardian, or other person having the lawful charge of such child.

"(b) It is not a defense to a prosecution under this section that the defendant is a parent entitled to joint custody of the child either on the basis of a court order or by virtue of the absence of a court order.

"(c)(1) Interference with parental custody is a class A person misdemeanor if the perpetrator is a parent entitled to joint custody of the child either on the basis of a court order or by virtue of the absence of a court order.

"(2) Interference with parental custody is a severity level 10, person felony in all other cases." K.S.A. 22-3422.

"(a) Aggravated interference with parental custody is:

"(1) Hiring someone to commit the crime of interference with parental custody, as defined by K.S.A. 21-3422 and amendments thereto; or

"(2) the commission of interference with parental custody, as defined by K.S.A. 21-3422 and amendments thereto, by a person who:

"(A) Has previously been convicted of the crime;

"(B) commits the crime for hire;

"(C) takes the child outside the state without the consent of either the person having custody or the court;

"(D) after lawfully taking the child outside the state while exercising visitation rights or parenting time, refuses to return the child at the expiration of that time;

"(E) at the expiration of the exercise of any visitation rights or parenting time outside the state, refuses to return or impedes the return of the child; or

"(F) detains or conceals the child in an unknown place, whether inside or outside the state.

"(b) Aggravated interference with parental custody is a severity level 7, person felony.

"(c) This section shall be a part of and supplemental to the Kansas criminal code."

As stated in *In re Marriage of Harris*, 20 Kan. App. 2d 50, 56-57, 883 P.2d 785, *rev. denied* 256 Kan. 995 (1994):

"Kan. Const. art. 15, § 6 provides: 'The legislature shall provide for the protection of the rights of women, in acquiring and possessing property, real, personal and mixed, separate and apart from the husband; and shall also provide for their equal rights in the possession of their children.' Under this constitutional provision, 'in the absence of a court order both parents have an equal right to the custody of their minor children.' *State v. Al-Turck*, 220 Kan. 557, 558, 552 P.2d 1375 (1976)."

Under the facts of our case, the record shows that no court order existed concerning visitation rights or custody of the child of Renfro and Berry.

Renfro's principal argument on appeal is based on *State v. Al-Turck*, 220 Kan. 557, 552 P.2d 1375 (1976). In *Al-Turck*, the defendant and his wife were involved in divorce proceedings. Prior to a custody hearing, the defendant picked up their child with the pretense of taking the child on a picnic but instead flew with the child to Iraq. The defendant was convicted of interference with parental custody. The Kansas Supreme Court held that because there was no court order of custody when the defendant took the child, the defendant's exercise of his right to equal custody could not subject the defendant to criminal charges. The conviction was reversed, and the defendant was discharged. 220 Kan. at 559.

Renfro argues that if no crime was committed in *Al-Turck*, then no crime was committed in the instant case because there is no court order concerning the child's custody.

This argument is flawed as it ignores the 1986 amendment to K.S.A. 21-3422 which added subsection (b): "It is not a defense to a prosecution under this section that the defendant is a parent entitled to joint custody of the child either on the basis of a court order or by virtue of the absence of a court order." L. 1986, ch. 119, sec. 1.

Renfro argues this amendment may have been intended to legislatively overrule the *Al-Turck* result but asserts the legislature cannot overrule a constitutional ruling with a statutory amendment. As authority for this contention, Renfro points us to *Moore v. Shanahan*, 207 Kan. 645, 651, 486 P.2d 506 (1971), which we do not read to support his contention and restates the rule that

"the constitutionality of a statute or concurrent resolution is presumed, and that all doubts must be resolved in favor of their validity, and before they may be

stricken down, it must appear the infringement of the Constitution is clear beyond substantial doubt. It is the court's duty to uphold the concurrent resolutions, rather than defeat them, and if there is any reasonable way to construe them as constitutionally valid, that should be done." 207 Kan. at 651.

While the result in an individual case becomes final after all appellate rights are exhausted, it is not improper for the Kansas Legislature to alter or amend statutory provisions which have the effect of requiring a different result to a similar factual scenario which occurs in the future. See *State v. McKessor*, 246 Kan. 1, 10, 785 P.2d 1332 (1990) ("The legislature, of course, could overrule our interpretation in [*State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976)], at any time by amending K.S.A. 21-3420[b]."); *State v. Henning*, 38 Kan. App. 2d 706, Syl. ¶ 1, 171 P.3d 660 (2007) ("[T]he Kansas Legislature, by enacting the 2006 amendment in K.S.A. 2006 Supp. 22-2501[c] intended to change the rule established by *State v. Anderson*, 259 Kan. 16, 22, 910 P.2d 180 [1996], and allow searches incident to arrest to extend to any crime as constitutionally allowed by *New York v. Belton*, 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860, *reh. denied* 453 U.S. 950 [1981].").

In *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 88-89, 106 P.3d 492 (2005), the court stated: " ' "When the legislature revises a law, it is presumed that the legislature intended to change the law as it existed prior to the amendment." ' [Citations omitted.]." Also, *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002), states: "As a general rule, statutes are construed to avoid unreasonable results. There is a presumption that the legislature does not intend to enact useless or meaningless legislation."

We have shown that the legislature has the authority and the right to amend K.S.A. 21-3422. The only question then is, having done so, does the language added in subsection (b) make the provision unconstitutional? We hold that it does not. If anything, the amendment protects the fundamental rights of a parent by preventing one parent from depriving the other parent of the right to be a parent in the absence of a court order or other custody agreement.

In our case, Renfro took the child and deliberately concealed the child's whereabouts from April 3 until April 12, 2006. As there

was no court order or written custody agreement, both Renfro and Berry were joint custodians and had equal custody. However, the custodial interference statute states interference with parental custody occurs when a child is taken from a parent "with the intent to detain or conceal such child from its parent." K.S.A. 21-3422(a). In addition, it is not a defense to a prosecution that the defendant is a parent entitled to joint custody of the child by virtue of or in the absence of a court order. K.S.A. 21-3422(b).

Under the facts of our case, Renfro deprived Berry of her equal right to custody of the child when he took and concealed the whereabouts of their son. While the fundamental right to be a legal parent of a child is constitutionally recognized, that right can be abrogated if a compelling reason exists, *In re Adoption of B.M.W.*, 268 Kan. 871, 881, 2 P.3d 159 (2000). The absence of a court order is not a compelling reason sufficient to allow a father to secrete his child from the mother.

The language set forth in K.S.A. 21-3422(b) was lawfully enacted. Its easily understood provisions provide essential equal protection to parents in protecting their rights as to the care, custody, and control of their children. K.S.A. 21-3422 and 21-3422a are constitutional.

The result we reach is consistent with that reached in other jurisdictions that have considered this question. See *Strother v. State*, 891 P.2d 214, 223 (Alaska App. 1995) (The court held that the statute embodied the rule that when parents are joint custodians, neither parent can take exclusive physical custody of the child in a manner defeating the rights of the other parent.); *State v. Donahue*, 140 Ariz. 55, 57, 680 P.2d 191 (Ct. App. 1984), *rev. denied* April 17, 1984 (The father, in the absence of a court order, had custody equal to that of the mother but did not have a right to custody of the children to the exclusion of the mother.); *State v. Todd*, 509 A.2d 1112, 1114-15 (Del. Super. 1986) (When parents are joint custodians, the parent who takes the child from the other parent infringes upon the other parent's rights.); *People v. Harrison*, 82 Ill. App. 3d 530, 531, 402 N.E.2d 822 (1980) (Child abduction statutes mean neither parent can remove the child without infringing on the other parent's powers, rights, or duties.); *State v. West*,

70 Or. App. 167, 171, 688 P.2d 406 (1984) (The focus of the custodial interference statute was to protect the rights and interests of the victims, *i.e.*, the child and the lawful custodian; the focus was not on the legal status of the one who does the taking.); *State v. Ohrt*, 71 Wash. App. 721, 724, 862 P.2d 140 (1993), *rev. denied* 123 Wash. 2d 1029 (1994) (Each parent had an equal right to custody of the children and shared custody in the absence of a court order.).

For all of the reasons previously set forth, we hold Renfro's conviction of aggravated interference with parental custody was constitutional.

Renfro also argues the evidence was insufficient to prove he intentionally deprived Berry of custody of the child or, alternatively, that it was not proven he detained or concealed the child at an unknown location, which requires him to be resentenced only for interference with parental custody.

"When the sufficiency of the evidence is reviewed in a criminal case, this court must consider all of the evidence, viewed in a light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Parker*, 282 Kan. 584, 597, 147 P.3d 115 (2006). However, a jury is not required to accept the defendant's version of the facts. If the defendant is convicted, the jury is presumed to have believed the State's evidence and to have drawn inferences in favor of the State. *State v. Aikins*, 261 Kan. 346, 392, 932 P.2d 408 (1997).

We have previously set forth the applicable statutes under which Renfro was charged, and they need not be repeated.

In this case, the jury was instructed that the State was required to prove (1) the child was under 16 years old, (2) he was in Berry's custody, (3) Renfro took the child, (4) Renfro took the child with intent to deprive Berry of custody, and (5) Renfro detained or concealed the child in a place unknown to Berry, either inside or outside of Kansas. A review of the record shows the presence of substantial evidence under which the jury could have found Renfro guilty beyond a reasonable doubt.

Although Renfro did talk to Berry almost every day, he consistently refused to disclose where he and the child were located. We need not repeat all the facts which we first set forth, but they plainly showed the child was detained in another state and that Renfro took the child without Berry's consent with the intent to deprive her of custody.

There were different facts which were favorable to Renfro, but the jury is the ultimate factfinder and is not bound to accept a defendant's version of the facts in question. *Aikins*, 261 Kan. at 392.

In denying the motion for a new trial, the judge who heard the preliminary hearing and the trial pointed out that Renfro not only refused to tell Berry where the child was, he also would not tell the police officer. We hold there was substantial competent evidence to uphold the jury's verdict.

Renfro raised an issue on appeal concerning the no contact order by the trial judge, which the parties agree is moot based on the revocation of probation.

Affirmed.