FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAR 07 2013

_Madsen, CJ_
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on March 7, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 85860-8 |
| v. | ) | |
| | ) | En Banc |
| JOSE R. VELIZ, JR., | ) | |
| | ) | |
| Petitioner. | ) | Filed _____ MAR 07 2013 _____. |
| | ) | |

WIGGINS, J.—In this case we must decide whether a domestic violence protection order that includes a child visitation provision qualifies as a "court-ordered parenting plan," a necessary element under a specific provision of Washington's first degree custodial interference statute, RCW 9A.40.060(2). We conclude that it does not because the legislature created the phrase "court-ordered parenting plan" as a term of art that refers specifically to a document created under chapter 26.09 RCW. Accordingly, we reverse the Court of Appeals and remand for dismissal of Jose Veliz's custodial interference conviction for insufficient evidence.

## FACTS

Jose R. Veliz Jr. and Lorena Velasco were married in 2006 following the birth of their daughter, N.V., in 2004. They separated in April 2008, and Velasco obtained an order for protection on May 5, 2008 pursuant to the Domestic Violence

Prevention Act (DVPA), chapter 26.50 RCW. The protection order included the partially handwritten provision, "[Veliz] will be allowed visitations as follows: Weekends Saturdays & Sundays. [O]r in accordance with a Court approved parenting plan. Sat & Sunday. Sat from 10 a.m. to Sunday at 5 p.m." Clerk's Papers (CP) at 37. The protection order was signed by Veliz, Velasco, and the judge. Veliz thereafter promptly filed for dissolution of his marriage to Velasco on May 14, 2009.

Veliz and Velasco complied with the protection order's visitation provision over the next three months without incident. On Saturday, August 16, 2008, Veliz had a normally scheduled visitation with N.V. Veliz did not return N.V. to Velasco on the next day by 5:00 p.m. as required by the protection order. Veliz had taken N.V. out of Washington, first to Los Angeles, California, and later to various cities in Mexico.

On August 22, 2008, before any formal parenting plan had been filed, the prosecutor charged Veliz by information with first degree custodial interference under RCW 9A.40.060(2)(a). The information stated:

> [D]uring the time intervening between the 16th day of August, 2008, and the 17th day of August, 2008, then and there, being the parent of and with intent to deny access from Lorena [Velasco], the other parent having the lawful right to time with N.V. pursuant to a *court ordered parenting plan*, did retain N.V., a child under eighteen years of age, and intended to hold N.V. permanently or for a protracted period.

CP at 56 (emphasis added). Three days later, on August 25, 2008, the court entered a temporary parenting plan in the dissolution proceeding pursuant to RCW 26.09.197. The State has never amended the information.

Veliz and N.V. did not return to the United States until December 21, 2008 when Veliz was arrested at the Mexico-United States border.

2

Before trial, Veliz filed a *Knapstad*[1] motion to dismiss. He argued that the May 5, 2008 protection order was not a "court-ordered parenting plan" and consequently that there was insufficient evidence to prove first degree custodial interference under RCW 9A.40.060(2) as a matter of law. The trial court denied Veliz's *Knapstad* motion. A jury convicted Veliz of custodial interference in the first degree under RCW 9A.40.060(2). The Court of Appeals affirmed Veliz's conviction, holding that the May 5, 2008 protection order was a "court-ordered parenting plan" for the purposes of the first degree custodial interference statute. *State v. Veliz*, 160 Wn. App. 396, 408, 247 P.3d 833 (2011).

We granted review on the limited issue of whether a domestic violence protection order can constitute a "court-ordered parenting plan" for the purposes of the first degree custodial interference statute. *State v. Veliz*, 171 Wn.2d 1028, 257 P.3d 663 (2011). Answering this question in the negative, we now reverse.

## ANALYSIS

Veliz challenges his conviction for first degree custodial interference on the ground that one of the elements of the crime—a court-ordered parenting plan—was not proved beyond a reasonable doubt. We agree and hold that there was insufficient evidence to convict Veliz in this case. The State failed to prove an essential element of RCW 9A.40.060(2), namely, the existence of a court-ordered parenting plan. We reach this conclusion for three reasons. First, the context and history of the parenting plan concept in Washington reveals that the legislature created the term "parenting plan" as a term of art. Because the legislature intended

---

[1] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

"parenting plan" as a term of art, the term as used in the custodial interference statutes has the same meaning as in the dissolution proceedings statutes, chapter 26.09 RCW. Second, the related language and history of the DVPA, chapter 26.50 RCW, demonstrates that the legislature did not intend DVPA protection orders to constitute parenting plans. Finally, in the first degree custodial interference statute, the legislature has protected the parent-child relationship by creating alternatives for prosecuting parents who abduct their children in the absence of a parenting plan. Accordingly, we conclude that there was insufficient evidence to convict Veliz of first degree custodial interference, reverse the Court of Appeals, and remand with instructions to dismiss Veliz's conviction.

I.    The term "parenting plan" is a term of art derived from the context in which the legislature created it

We begin by determining the meaning of "court-ordered parenting plan" as it is stated in RCW 9A.40.060(2).[2] "We review questions of statutory interpretation de novo." *State v. Morales*, 173 Wn.2d 560, 567 n.3, 269 P.3d 263 (2012). Our "fundamental objective in construing a statute is to ascertain and carry out the intent of the legislature." *Id.* at 567. "We construe the meaning of a statute by reading it in

---

[2] RCW 9A.40.060(2) provides :

> A parent of a child is guilty of custodial interference in the first degree if the parent takes, entices, retains, detains, or conceals the child, with the intent to deny access, from the other parent having the lawful right to time with the child pursuant to a court-ordered parenting plan, and:
>
> (a) Intends to hold the child permanently or for a protracted period; or
>
> (b) Exposes the child to a substantial risk of illness or physical injury; or
>
> (c) Causes the child to be removed from the state of usual residence.

its entirety, and consider the entire sequence of all statutes relating to the same subject matter." *Id.* (citation omitted).

The first degree custodial interference statute does not define "court-ordered parenting plan." Neither is the term defined in RCW 9A.40.010 (defining kidnapping, unlawful imprisonment, and custodial interference terms) or in RCW 9A.04.110 (defining general criminal code terms).[3] When a statutory term is undefined, we typically apply the term's "'plain and ordinary meaning unless a contrary legislative intent is indicated.'" *State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2011) (quoting *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 920-21, 969 P.2d 75 (1998)). But when a technical term or term of art is used, we "turn[] to the technical definition of a term of art even where a common definition is available." *City of Spokane v. Dep't of Revenue*, 145 Wn.2d 445, 452, 38 P.3d 1010 (2002).

This case requires us to determine which meaning the legislature intended— the common and ordinary meaning or the term-of-art meaning of the term "parenting plan." In light of the context and history of the legislative enactments involving parenting plans, both in the domestic relations title and in the custodial interference statutes, we hold that the legislature intended "parenting plan" to mean the specific type of document a court orders pursuant to the dissolution proceedings chapter, 26.09 RCW.

---

[3] Though the terms "[p]ermanent parenting plan" and "[t]emporary parenting plan" are defined in RCW 26.09.004(3) and (4), this statute states that the definitions "apply throughout this chapter" signifying that the terms are not meant to define terms appearing in the criminal code. *Id.*

## A. The parenting act of 1987

The legislature invented the "parenting plan" in 1987 when it adopted the parenting act. LAWS OF 1987, ch. 460, §§ 1–61. The parenting act of 1987 fundamentally changed the legal procedures and framework addressing the parent-child relationship in Washington. The legislature explained the policy underlying the act: "The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." LAWS OF 1987, ch. 460, § 2 (codified at RCW 26.09.002).

To realize its policy objective, the legislature significantly changed the legal terminology applicable to parenting. Previous statutes couched much of the parent-child relationship in terms of which parent had "custody" and which parent was allowed "visitation." *See, e.g.*, former RCW 26.09.010 (1975), *amended by* LAWS OF 1987, ch. 460, § 1; former RCW 26.09.050,.070 (1973), *amended by* LAWS OF 1987, ch. 460, §§ 5–6. As the drafting committee on the parenting act noted, these terms tended to treat children as a prize awarded to one parent and denied the other. DRAFTING COMM., 1987 PROPOSED PARENTING ACT: REPLACING THE CONCEPT OF CHILD CUSTODY cmt. at 2 (sponsored by Wash. State Rep. Appelwick) (on file with Wash. State Archives). The drafters also noted that the "current system fails to separate the process of ending the marriage from the process of changing the parent and child relationship" and that there were "no adequate standards by which the parties and the court can define appropriate continuing relationships of children with both parents." *Id.* at 3.

6

The 1987 parenting act addressed these issues by providing for specific residential schedules, outlining the responsibilities of both parents, and planning for the future needs of children. *Id.* at 11-13. Consistent with this objective, the parenting act eliminated most references to custody and visitation and replaced them with the more functional terms "parenting plan" and "residential schedule." *See, e.g.*, LAWS OF 1987, ch. 460, §§ 5–6, 11–12, 15, 19 (codified as amended at RCW 26.09.050, .070, .110, .160, .210, .260); *see also* HOUSE JOURNAL, 50th Leg., Reg. Sess., at 1539 (Wash. 1987) ("[The parenting act] eliminates the concept of custody in favor of separating decision-making from the allegation [sic] of the residential schedule.").

The increased functionality of the legislature's approach is evident in section 8 of the act, listing objectives of permanent parenting plans, including providing for children's physical care and emotional stability, stating each parent's responsibilities, minimizing children's exposure to parental conflict, and anticipating and meeting future child needs without having to continuously revisit the plan. LAWS OF 1987, ch. 460, § 8 (codified at RCW 26.09.184). The act also requires the parenting plan to contain provisions for dispute resolution, allocation of decision making authority, and a residential schedule. *Id.* Similarly, the act calls for affidavits from both parents to be considered in issuing a temporary parenting plan, including parents' contact information, each parent's performance of parenting functions in the preceding year, the parents' current work and child-care schedules, and any negative factors that pose a serious risk to children. *Id.* § 13 (codified at RCW 26.09.194). These statutes

reveal strong intent that parenting plans were to become the new standard to address the rights of parents and the needs of children.

The legislature harmonized this complete overhaul of the legal concepts of parenting with Washington's criminal statutes by importing the language and terminology of the parenting act into the criminal code. Sections 52 through 54 of the parenting act would have amended the first and second degree custodial interference statutes by assigning criminal liability to those who "with the intent to deny access to the child . . . by . . . a parent with whom the child resides pursuant to a *parenting plan order* . . . take[], entice[], retain[], detain[], or conceal[] the child . . . from a parent . . . ." LAWS OF 1987, ch. 460, §§ 52–54 (emphasis added). This proposed change to the custodial interference statutes also shows that the legislature intended the new parenting plan framework to extend beyond the domestic relations title into the criminal code.[4]

## B. 1989 Amendments

In 1989, the legislature revisited the parenting act of 1987, continuing to delete the old terms "custody" and "visitation" to give way to parenting plan terminology. *See* LAWS OF 1989, ch. 375, §§ 2–3, 5, 12, 16, 18 (codified as amended

---

[4] Governor Booth Gardner vetoed these sections, expressing concerns "that involving the police in settling non-violent visitation disputes where harm to the child is not evident is an improper approach." 1987 FINAL LEGISLATIVE REPORT, 50th Wash. Leg., at 368 (letter from Governor Booth Gardner to House of Representatives (May 18, 1987)). Governor Gardner also cited his full veto of Substitute Senate Bill 5088, which made it second degree custodial interference to deny access of a child to a person with court-ordered visitation rights. *Id.*; *see also* 1987 FINAL LEGISLATIVE REPORT, 50th Wash. Leg., at 195 (outlining effects of Substitute S.B. 5088). In the veto message on Substitute Senate Bill 5088, Governor Gardner stated that he chose to veto amendments to second degree custodial interference because "[w]e need to give this new parenting/custody determination procedure in [the Parenting Act] a chance to work." 1987 FINAL LEGISLATIVE REPORT, 50th Wash. Leg., at 424 (letter from Governor Booth Gardner to Senate (May 18, 1987)).

at RCW 26.09.015, .020, .080, .220, .285, .909); *see also* 1989 FINAL LEGISLATIVE REPORT, 51st Wash. Leg., at 161 ("Several obsolete references to custody and visitation are corrected . . . .").

In addition to amending provisions of the parenting act, the legislature began the task that Governor Booth Gardner had curtailed by veto in 1987—incorporating the term "parenting plan" into the custodial interference statutes. With regard to second degree custodial interference, the legislature added a new section that read

> A parent of a child is guilty of custodial interference in the second degree if: (a) The parent takes, entices, retains, detains, or conceals the child, with the intent to deny access, from the other parent having the lawful right to time with the child pursuant to a *court-ordered parenting plan*; or (b) the parent has not complied with the residential provisions of a *court-ordered parenting plan* after a finding of contempt under . . . this act; or (c) if the court finds that the parent has engaged in a pattern of willful violations of the court-ordered residential provisions.

LAWS OF 1989, ch. 318, § 2(2) (emphasis added) (codified as amended at RCW 9A.40.070). The legislature also amended chapter 26.09 RCW provisions to require parenting plans to include warning language that violation of the residential provisions "may be a criminal offense under RCW 9A.40.070(2)" (capitalization omitted). LAWS OF 1989, ch. 318, § 4 (codified at RCW 26.09.165). The legislature's 1989 amendments provide further support that the legislature intended the term "parenting plan" to have a term-of-art meaning consistent with chapter 26.09 RCW.

### C. 1994 Amendments

Five years later in 1994, the legislature made additional amendments that demonstrate its continued commitment to using the specific parenting plan terminology. This time, the legislature amended the first degree custodial

interference statute (under which Veliz was charged) to match the 1989 amendments to the second degree custodial interference statute:

> A parent of a child is guilty of custodial interference in the first degree if the parent takes, entices, retains, detains, or conceals the child, with the intent to deny access, from the other parent having the lawful right to time with the child pursuant to a court-ordered parenting plan, and:
>
> (a) Intends to hold the child permanently or for a protracted period; or
>
> (b) Exposes the child to a substantial risk [of] illness or physical injury; or
>
> (c) Causes the child to be removed from the state of usual residence.

LAWS OF 1994, ch. 162, § 1(2) (codified at RCW 9A.40.060(2)). The legislature also inserted a reference to first degree custodial interference in the warning provision required in all parenting plan orders in RCW 26.09.165, *amended by* LAWS OF 1994, ch. 162, § 2. These amendments addressed the need for consistency between the first and second degree custodial interference provisions and authorized felony charges against parents who violated parenting plan provisions. Indeed, the final legislative report provided that "[t]he effect of having amended only custodial interference in the second degree to reflect the updated terminology of the parenting plan is that a parent who denies the other parent access to a child when a parenting plan is in effect is guilty only of a gross misdemeanor regardless of the extent or nature of the denial." 1994 FINAL LEGISLATIVE REPORT, 53d Leg., at 68. These amendments therefore show that the legislature intended the references to parenting plans in the custodial interference statutes to refer, as a term of art, to the specific parenting plan documents created in chapter 26.09 RCW.

10

The various legislative enactments outlined above evidence a continuing clear legislative intent to incorporate the concept of the "parenting plan" into both our domestic relations and criminal statutes. At every step, the legislature has sought to make the first degree custodial interference provisions more consistent with the policies and terminology underlying the parenting act of 1987. Accordingly, we hold that the legislature intended "court-ordered parenting plan" as stated in RCW 9A.40.060(2) to be a term of art referring to the specific document provided for by chapter 26.09 RCW.[5]

### D. Other provisions of Washington's domestic relations title distinguish between parenting plans and orders including residential provisions

In contrast to chapter 26.09 RCW that primarily employs the term "parenting plan," the legislature has directed courts to make "residential provisions for children" in the context of nonparental custody determinations under chapter 26.10 RCW and custody decisions under Washington's Uniform Parentage Act (UPA), chapter 26.26 RCW.[6] The term "residential provisions" in these statutes permits the inclusion of restraining orders enforceable under the DVPA, chapter 26.50 RCW. The legislature's use of different terminology shows that the legislature means to distinguish between residential provisions under chapters 26.10 or 26.26 RCW that

---

[5] We note our agreement with the holding in *State v. Pesta*, 87 Wn. App. 515, 522, 942 P.2d 1013 (1997), that the State need not prove all the actual elements of a parenting plan enumerated in RCW 26.09.184 or RCW 26.09.194 to properly prosecute a defendant for custodial interference under RCW 9A.40.060(2). Consistent with *Pesta*, we hold only that there must actually be a parenting plan ordered by a court in existence to satisfy an essential element of first degree custodial interference charged under RCW 9A.40.060(2).

[6] Chapter 26.09 RCW does use the term "residential provisions," but only as a discrete portion of a parenting plan. *See* RCW 26.09.187(3).

11

can include DVPA restraining orders and parenting plans ordered under chapter 26.09 RCW.

Indeed, the legislature has expressed a clear policy choice to differentiate Washington statutes related to third-party custody decisions from the 1987 parenting act. *See* RCW 26.10.010 ("It is the intent of the legislature to reenact and continue the law relating to third-party actions involving custody of minor children in order to distinguish that body of law from the []1987 parenting act amendments to chapter 26.09 RCW . . . ."). Consistent with this clear intent, chapter 26.10 RCW allows courts to "consider, approve, or make *provision* for . . . [c]hild *custody, visitation,* and the support of any child entitled to support." RCW 26.10.040(1)(a) (emphasis added). In other words, instead of providing for parenting plans in third-party custody situations, the legislature adhered to the preexisting terminology of custody and visitation. Similarly, the UPA employs the term "residential provisions." RCW 26.26.130(7) states in pertinent part that "[o]n the same basis as provided in chapter 26.09 RCW, the court shall make *residential provisions* with regard to minor children of the parties, except that a parenting plan shall not be required unless requested by a party." (Emphasis added.) This language indicates that the legislature intended to create a distinction between the "residential provisions" entered under the UPA and the "parenting plan" document. Moreover, as with the nonparental custody statutes, the UPA permits courts to enter restraining orders or domestic violence protection orders under chapter 26.50 RCW, RCW 26.26.130(9), and provides that violations of such orders are criminal offenses under the DVPA, RCW 26.26.130(10).

12

In both the UPA and the nonparental custody statutes, the legislature has opted for courts to make residential provisions for child custody rather than issue formal parenting plans. Alongside these residential provisions, the legislature also permits documents issued under chapters 26.10 and 26.26 RCW to include restraining orders and domestic violence protection orders enforceable under the DVPA. This demonstrates that the legislature has distinguished between parenting plans and UPA/nonparental custody orders that include both restraining and residential provisions. This further supports the conclusion that by the term "parenting plan," the legislature means the specific document authorized under chapter 26.09 RCW.

II.  Protection orders under the DVPA are not parenting plans

The dissent insists that a domestic violence protection order under the DVPA, chapter 26.50 RCW, is included in the definition of parenting plan. Dissent at 6. To the contrary, the language of relevant DVPA provisions does not support this proposition, and the 1987 amendments to the DVPA in the parenting act demonstrate that the legislature did not intend DVPA orders to be parenting plans.

A. *The language of the relevant DVPA provision precludes equating DVPA orders to parenting plans*

The DVPA allows the court to provide relief to a party suffering domestic violence by inserting a child residential provision in a DVPA order: "On the same basis as is provided in chapter 26.09 RCW, the court shall make residential provision with regard to minor children of the parties." RCW 26.50.060(1)(d). The statute goes on to read, "However, parenting plans as specified in chapter 26.09

RCW shall not be required under this chapter." *Id.*[7] When the legislature uses different terms in the same statute, we presume that it intends different meanings. *In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wn.2d 834, 842, 215 P.3d 166 (2009); *State v. Mendoza*, 165 Wn.2d 913, 921, 205 P.3d 113 (2009). The dissent and the Court of Appeals interpret RCW 26.50.060(1)(d) as authorizing orders creating the equivalent of a parenting plan. *Veliz*, 160 Wn. App. at 408. To the contrary, a court entering a DVPA order is permitted to make "residential provision with regard to minor children" not to create parenting plans. RCW 26.50.060(1)(d). The plain language of the statute itself distinguishes between "residential provision[s]" and "parenting plans." In short, if the legislature had intended the residential provisions in domestic violence protection orders to have the force of parenting plans for the purposes of the custodial interference statute, it would have said so by referring to such orders as parenting plans.

B. *The 1987 parenting act limited a court's authority under the DVPA to make custody and visitation determinations*

The DVPA's legislative history buttresses our conclusion. Prior to 1987, the DVPA authorized the court entering a domestic violence protection order to, "[o]n the same basis as is provided in chapter 26.09 RCW, award temporary custody and establish temporary visitation with regard to minor children of the parties, and restrain any party from interfering with the custody of the minor children." Former

---

[7] The dissent asserts that this "indicates that the legislature recognizes more than one type of parenting plan, including parenting plans other than those created pursuant to chapter 26.09 RCW." Dissent at 5-6. But the dissent reads too much into the language of RCW 26.50.060(d). The phrase "parenting plans as specified in chapter 26.09 RCW" means simply that parenting plans, a term of art, are specifically established in chapter 26.09 RCW.

14

26.50.060(3) (1985), *amended by* LAWS OF 1987, ch. 460, § 55. This broad language suggests a domestic violence restraining order could include custody and visitation provisions similar to those authorized under chapter 26.09 RCW.

In 1987, the legislature decided to incorporate the parenting plan concept into the DVPA alongside several other statutes. The parenting act transformed the language of former RCW 26.50.060 to its current form, allowing the court only to make "residential provision with regard to minor children" but cautioning that "parenting plans as specified in chapter 26.09 RCW shall not be required." RCW 26.50.060(1)(d). The contrast between the new statute and the old statute is stark. The legislature removed all custody and visitation language from 26.50.060. It did not, however, replace it with corresponding parenting plan language. This omission indicates that the legislature did not intend DVPA orders to be parenting plans. This further supports our holding that when it speaks of parenting plans, the legislature refers to the term of art expressed in chapter 26.09 RCW, not the provisions of the DVPA.

III.  The State could have charged Veliz with first degree custodial interference without showing the violation of a "court-ordered parenting plan"

The dissent asserts that it is important to interpret "court-ordered parenting plan" to include residential provisions in a DVPA restraining order so that the State can charge a felony for violation of a restraining order. Dissent at 8-9 (quoting FINAL B. REP. on H.B. 2333, 53d Leg., Reg. Sess. (Wash. 1994)). The dissent also accuses us of "prioritiz[ing] the rights of the criminal defendant over the rights of the

15

victims," dissent at 2, and "plac[ing] parents such as Lorena Velasco in an untenable position," dissent at 9.

But the dissent's assertions wholly overlook the fact that the State has another option available to charge a defendant with the felony of custodial interference in the first degree. RCW 9A.40.060(1). In fact, the only provision that requires the State to prove the existence of a "court-ordered parenting plan" is the provision at issue in this case, RCW 9A.40.060(2).

By contrast, the State may charge a person with first degree custodial interference without having to prove the existence of a parenting plan at all.[8] It appears rather plainly that subsection (1) of RCW 9A.40.060 would have sufficed to charge Veliz without regard to the existence of a "court-ordered parenting plan." Because the State could have charged Veliz under subsection (1) of the first degree custodial interference statute, the State could have obtained a felony warrant requiring the cooperation of Washington's sister states, which should assuage the

---

[8] RCW 9A.40.060(1), the first degree custodial interference statute, provides:

> A relative of a child . . . is guilty of custodial interference in the first degree if, with the intent to deny access to the child . . . by a parent . . . the relative takes, entices, retains, detains, or conceals the child . . . from a parent . . . and:
>
> (a) Intends to hold the child . . . for a protracted period; or
>
> (b) Exposes the child . . . to a substantial risk of illness or physical injury; or
>
> (c) Causes the child . . . to be removed from the state of usual residence; or
>
> (d) Retains, detains, or conceals the child . . . in another state after expiration of any authorized visitation period with intent to intimidate or harass a parent . . . or to prevent a parent . . . from regaining custody.

RCW 9A.40.060(1)'s term "[r]elative" is defined in the criminal code as "an ancestor, descendant, or sibling . . . ." RCW 9A.40.010(5); *see also State v. Ohrt*, 71 Wn. App. 721, 724, 862 P.2d 140 (1993) (holding that the term "ancestor" used in the definition of "relative" includes a parent).

dissent's concern. Furthermore, we do not neglect crime victims or leave them in "untenable position[s]," dissent at 9, by requiring the State to charge the crime of first degree custodial interference under one of the statutory provisions that it can prove.

## CONCLUSION

We hold that when the legislature included the term "court-ordered parenting plan" in RCW 9A.40.060(2), it meant parenting plans ordered by a court under the specific provisions of chapter 26.09 RCW. The meaning of the term "parenting plan" is thus its meaning as a term of art. Because there was no "court-ordered parenting plan" in Veliz's case at the time he was charged under RCW 9A.40.060(2), there is insufficient evidence to sustain Veliz's conviction. Accordingly, we reverse the Court of Appeals and remand for dismissal of Veliz's conviction.

_____
Wiggins, J.

WE CONCUR.

_____
Madsen, C.J.

_____
Fairhurst, J.

_____

_____
Chambers, J., P.T.

_____

_____

No. 85860-8

J.M. JOHNSON, J. (dissenting)—The majority errs by unnecessarily limiting the definition of "court-ordered parenting plan" under RCW 9A.40.060(2) to documents created pursuant to chapter 26.09 RCW. I would affirm the Court of Appeals and hold that when RCW 26.50.060 orders contain residential provisions for minor children, they are "court-ordered parenting plan[s]." Accordingly, a violation of a domestic violence protection order's residential provisions for children should constitute custodial interference under RCW 9A.40.060(2). To hold otherwise would be contrary to the rules of statutory construction and the legislature's express intent concerning the treatment of crime victims.

The legislature has declared its intent to "ensure that all victims and witnesses of crime are treated with dignity, respect, courtesy, and sensitivity." RCW 7.69.010. The rights of victims, survivors, and witnesses to crimes should be protected "in a manner no less vigorous than the

1

protections afforded criminal defendants." *Id.* The legislature has further recognized the vulnerability of child victims, declaring that they must be treated with "special care." RCW 7.69A.010. The majority's interpretation of the statute prioritizes the rights of the criminal defendant over the rights of the victims—the abducted child, N.V., and her mother, Lorena Velasco. I respectfully dissent.

## STANDARD OF REVIEW

We review questions of statutory interpretation de novo. *City of Spokane v. County of Spokane*, 158 Wn.2d 661, 672-73, 146 P.3d 893 (2006). The fundamental objective of statutory interpretation is to ascertain and carry out the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). An undefined term will "be given its plain and ordinary meaning unless a contrary legislative intent is indicated." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 920-21, 969 P.2d 75 (1998). "Plain meaning 'is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010) (quoting *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d

2

1007 (2009)). Only if the statute is ambiguous do we "resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

The legislature has prescribed that "[t]he provisions of [the criminal code] shall be construed according to the fair import of their terms but when the language is susceptible of differing constructions it shall be interpreted to further [four] general purposes." RCW 9A.04.020(2). These purposes are as follows:

> (a)    To forbid and prevent conduct that inflicts or threatens substantial harm to individual or public interests;
> (b)    To safeguard conduct that is without culpability from condemnation as criminal;
> (c)    To give fair warning of the nature of the conduct declared to constitute an offense;
> (d)    To differentiate on reasonable grounds between serious and minor offenses, and to prescribe proportionate penalties for each.

RCW 9A.04.020(1).

ANALYSIS

The plain and unambiguous language of RCW 9A.40.060 indicates that "court-ordered parenting plan" includes domestic violence protection

orders that contain residential provisions for children. RCW 9A.40.060(2) provides that:

> A parent of a child is guilty of custodial interference in the first degree if the parent takes, entices, retains, detains, or conceals the child, with the intent to deny access, from the other parent having the lawful right to time with the child pursuant to a court-ordered parenting plan, and:
> (a) Intends to hold the child permanently or for a protracted period; or
> (b) Exposes the child to a substantial risk of illness or physical injury; or
> (c) Causes the child to be removed from the state of usual residence.

The statute itself does not define the term "court-ordered parenting plan." Where a term is undefined, it should be given its plain and ordinary meaning. *Ravenscroft*, 136 Wn.2d at 920-21. The plain meaning of a "parenting plan" is "[a] plan that allocates custodial responsibility and decision-making authority for what serves the child's best interests and that provides a mechanism for resolving any later disputes between parents." BLACK'S LAW DICTIONARY 1224 (9th ed. 2009). "Court-ordered parenting plan" is not, as the majority claims, a term of art limited only to those parenting plans created pursuant to chapter 26.09 RCW.

I agree with the Court of Appeals that the terms "'permanent parenting plan'" and "'temporary parenting plan'" within the dissolution

4

provisions of chapter 26.09 RCW are instructive. *State v. Veliz*, 160 Wn. App. 396, 405-06, 247 P.3d 833 (2011) (citing RCW 26.09.004(3), (4)). "'Permanent parenting plan'" is defined as "a plan for parenting the child, including allocation of parenting functions, which plan is incorporated in any final decree or decree of modification in an action for dissolution of marriage or domestic partnership, declaration of invalidity, or legal separation." RCW 26.09.004(3) "'Temporary parenting plan'" is defined as "a plan for parenting of the child pending final resolution of any action for dissolution of marriage or domestic partnership, declaration of invalidity, or legal separation which is incorporated in a temporary order." RCW 26.09.004(4). The meaning shared by these two definitions is "a plan for parenting a child," which is the plain and ordinary meaning of "'parenting plan.'" *Veliz*, 160 Wn. App. at 405-06.

This interpretation is supported by RCW 26.50.060(1)(d), which requires domestic violence protection orders to make residential provisions for minor children on the same basis as chapter 26.09 RCW. The section further states that "parenting plans as specified in chapter 26.09 RCW shall not be required under this chapter." RCW 26.50.060(1)(d). This indicates that the legislature recognizes more than one type of parenting plan,

including parenting plans other than those created pursuant to chapter 26.09 RCW. If "court-ordered parenting plan" is a term of art referring only to those parenting plans under chapter 26.09 RCW, then the language "as specified in chapter 26.09 RCW" is superfluous. Accordingly, the majority's construction of the term is improper, given that "[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

Here, the domestic violence protection order contained a plan for parenting N.V. The order included residential provisions such that N.V. would live with her mother during the week and see her father on weekends. The parties respected this agreement for several months until the defendant abducted N.V. out of state in violation of the court order. This protection order, which contained a plan for parenting the parties' child, should be considered a court-ordered parenting plan for the purposes of RCW 9A.40.060(2).

Although we need look no further than the plain and unambiguous language of the statute, the public policy supporting the Domestic Violence Prevention Act (DVPA), chapter 26.50 RCW, and the custodial interference

statute supports my conclusion. In 1984, the legislature enacted chapter 26.50 RCW, the DVPA, which authorizes orders of protection in cases of domestic violence. RCW 26.50.060. These court orders are of vast importance to women like Lorena Velasco, the mother here. First, they can be obtained without the assistance of a lawyer, which is critical for those who may not have adequate access to legal resources. Second, the parenting provisions are enforceable, so victims of domestic abuse are able to protect not only themselves, but also their children.

Child abduction is one of the most effective ways that domestic violence perpetrators control their victims. "Even after separation, batterers use the children as pawns to control the abused party." WASH. STATE GENDER AND JUSTICE COMM'N, DOMESTIC VIOLENCE MANUAL FOR JUDGES 2-36 (rev. ed. 2006). This tactic includes "[h]olding children hostage or abducting the children in efforts to punish the abused party or to gain the abused party's compliance." *Id.* at 2-37. Court orders under the DVPA are strong enforcement mechanisms that hold domestic violence perpetrators accountable for their actions. The majority's holding undermines this mechanism, effectively expressing that the orders' residential provisions are

less meaningful than parenting plans created pursuant to chapter 26.09 RCW.

The policy supporting the custodial interference statute similarly supports our interpretation. Washington's first degree custodial interference statute is aimed at the exact conduct perpetrated by Jose Veliz—one parent unlawfully depriving the other parent of time with the child. Under the majority's holding, this conduct would be a violation of RCW 9A.40.060(2) only if there were a court-ordered parenting plan in place under chapter 26.09 RCW. According to the majority, the same conduct would not be punishable under RCW 9A.40.060(2) if perpetrated in violation of a domestic violence protection order, even if the order's residential provisions for minor children met all the criteria for a chapter 26.09 RCW parenting plan. Child abduction in violation of a court order threatens harm to the child, the victim parent, and society. Furthermore, there is no risk that enforcing the court order in this way could inhibit legitimate noncriminal conduct. There is simply no basis to distinguish conduct that violates a domestic violence protection order from identical conduct that violates a parenting plan under chapter 26.09 RCW.

House Bill 2333 was enacted to address a potential problem arising in child abduction cases: "If a parent removes the child from the state with the intent to go underground, capturing the parent and returning the child may be very difficult, because law enforcement agencies in other states do not act on misdemeanor warrants from other states." FINAL B. REP. on H.B. 2333, 53d Leg., Reg. Sess. (Wash. 1994). Mr. Veliz may not have been arrested in California but for the felony custodial interference charges against him, and N.V. may never have been returned to her mother. The majority's holding places parents such as Lorena Velasco in an untenable position. The only available resource to protect them and their children may be to obtain a domestic violence protection order, but the majority holds that such an order cannot be the basis for a felony charge under RCW 9A.40.060(2). In such a case, a parent may be unlawfully separated from her abducted child, but out-of-state law enforcement agencies may be unable to aid in her child's safe return.

CONCLUSION

Because the rights of victims should be protected at least as vigorously as those of criminal defendants, I respectfully dissent. I would affirm the Court of Appeals and hold that when RCW 26.50.060 orders

contain residential provisions for minor children, they are "court-ordered parenting plan[s]." A violation of a domestic violence protection order's residential provisions for children would accordingly satisfy the violation of a "court-ordered parenting plan" requirement for prosecution of custodial interference under RCW 9A.40.060(2).

Owens, J.

González, J.

Stephens, J.

11