

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 73046-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| SANDRA LEE ALLEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 25, 2016 |
| | ) | |

VERELLEN, C.J. — Sandra Allen appeals her conviction for first degree theft. She argues the State failed to present sufficient evidence that she exerted unauthorized control over the property of another in violation of a partnership agreement because the term "partnership agreement" is limited to a legal partnership established to engage in business for profit. She also contends the State failed to present sufficient evidence that she committed theft by deception. We conclude that "partnership agreement" does not refer to the technical definition of "partnership," but rather to the plain, ordinary meaning of a joint activity undertaken whether or not for profit. Because a rational trier of fact could have found that Allen violated a partnership agreement and that, but for Allen's deception, the victim would not have given Allen her life savings, we affirm.

## FACTS

In 2012, Elizabeth Hughes lived in Federal Way, Washington, with her husband, three children, and seven pets. Hughes is a devout Christian. Although she did not belong to a specific church, she attended several churches.[1] She watched Christian television, and volunteered for Christian organizations.

Around June 2012, Hughes saw Sandra Allen at a local Wal-Mart. They had met once before. After Hughes discovered Allen was living in her car, Hughes invited Allen to stay the night at her house in Federal Way. Allen told Hughes that she was a prophet and a pastor. Hughes believed her:

> I mean, she was able to talk like a Christian, knew her Bible very well, knew her scriptures, was very well-presented in her demeanor, you know, had stories about walking with the Lord, and being a pastor. And there was no reason for me to doubt her, who she said she was at the time.[2]

Allen told Hughes that she and her friends "were not walking right with the Lord."[3]

When Allen retired to bed, she stayed in Hughes's home office. Hughes kept all significant personal records in that room, including bank records and tax records. Hughes stayed up until 2:00 or 3:00 a.m., and she noticed the light in the home office remained on. When Hughes knocked on the door to the office the next morning, Allen told her to leave her alone, claiming "she needed some time to be alone with God, and she was praying, and not to interrupt her."[4] Allen remained in the office for another two

---

[1] Report of Proceedings (RP) (Jan. 5, 2015) at 20.
[2] RP (Jan. 5, 2015) at 37.
[3] RP (Jan. 5, 2015) at 37.
[4] RP (Jan. 5, 2015) at 40.

hours and then abruptly left "in a real big hurry" because "God was telling her she had to leave."[5]

Soon after, Allen called Hughes and asked her to pay for a hotel room. On June 15, Hughes paid $276.24 for Allen's hotel room. Hughes also bought Allen food, vitamins, and a fan. She also paid rent for Allen's personal storage unit. Hughes "trusted [Allen] quite well."[6] Eventually, Allen told Hughes that Hughes owed God money:

> Well, [Allen] told me that she was a prophet and that God told her that I wasn't paying my tithes properly, because you're supposed to pay 10 percent of your income. And so I did pay donations, but she said that God told her that they weren't enough, and that I wasn't trusting him properly, and that I needed to go back and review every single amount of money that I owed the Lord for the past 10 years.
>
> And so she said, go home and write out, figure out exactly how much you owe God, 10 percent of your income, over a 10-year period, and then to report it to her, and tell her exactly how much that I owe the Lord, like write it out for Sandra [Allen] and give it to her. And then she was going to pray and see if I was telling the truth. And so then she prayed and she said that there was more money that I owed and that God told her it was such-and-such amount of money that I owed him in back tithing.[7]

Hughes described how Allen alternated between using love and fear to manipulate Hughes into paying her:

> Well, she would be very loving and kind on the one end and then very fearful and use scriptures that, if I don't do this, I'm disobeying the prophet of God. And she would send me text messages saying, "God is expecting you to be obedient," and then she would have periods of silence when she wouldn't talk to me until I did the next thing she told me I was supposed to do.
>
> And she told me things like, there was an earthquake coming and bad things would happen to my children if I didn't fulfill my obligations to

---

[5] RP (Jan. 5, 2015) at 40.
[6] RP (Jan. 5, 2015) at 55.
[7] RP (Jan. 5, 2015) at 50.

God on tithing . . . And every time I brought up questions, she would bring up a crisis going on with her and kind of silence me. She'd tell me to be quiet, that I talked too much. She was very controlling.[8]

Allen used biblical passages and parables to convince Hughes that God needed her to "obey the prophet of God"—Allen, specifically.[9] For example, Hughes testified that Allen referenced a passage in Malachi "that talks about robbing God with your tithes and offerings. And if you don't give God your tithes, you're robbing God."[10]

On June 20, 2012, Hughes withdrew $11,335.84 from her family's savings account and cashed out her entire retirement account worth $44,194.87. She gave all the money to Allen in two cashier's checks. The same day, Allen opened an account at Chase bank and deposited $55,330.71. Allen also wrote out a "receipt" to memorialize the money that Hughes had given her.[11] The note states that the "donation" was intended for ministry work:

Receipt of checks donated for outreach work, ministry building, church ministries, music publication, and helps.
This is to confirm that I, Pastor Sandra Allen, received a donation of funds from Elizabeth Hughes for the outreach work and for needy and Federal Way Outreach Ministries to help the indigent and any needy people. Elizabeth Hughes donated these funds freely and to the ministry to help the poor and the homeless. Funds were received on June 20th, 2012, 1:30 p.m. Elizabeth willingly donated these proceeds to help support this work and to help feed the needy, total amount, $55,330.71, Pastor Sandra Allen, Elizabeth Hughes, June 20th, 2012.[12]

---

[8] RP (Jan. 5, 2015) at 56-57.
[9] RP (Jan. 5, 2015) at 57.
[10] Malachi 3:8–9: "Will a man rob God? Yet you are robbing Me! But you say, 'How have we robbed You?' In tithes and offerings. You are cursed with a curse, for you are robbing Me, the whole nation of you!" RP (Jan. 5, 2015) at 59.
[11] Exhibit (Ex.) 27
[12] Ex. 27; RP (Jan. 5, 2015) at 51-52.

Hughes believed this money was specifically for the ministry Allen wanted to found.

Hughes testified she would not have given Allen that amount of money had she

believed Allen would spend it on herself:

> Q. Would you have given her that $55,000 if she had told you that she just needed some help?
> A. No, not that amount of money, no, sir.
> Q. And why is that?
> A. Because we didn't have that much amount of money give-able easily.
> Q. Okay. And you were willing to give this to start a ministry?
> A. Yes, sir.[13]

On June 21, the day after Hughes paid Allen, Allen withdrew $20,000 in cash from the

Chase bank account. On June 22, Allen paid $7,500 in cash for a 2002 Jaguar sedan.

Hughes did not know about the car purchase until a detective told her about it.

The next week, Allen told Hughes that "she made a mistake" and that "God said

[Hughes] actually needed to pay her 12 years of tithing,"[14]

> [Allen] would change her mind [about the amount]. And so when I tried to say, "Well, how come God is not pleased with every time I try to obey him? Then he changes the bar and seems to, like, you know, keep changing his plan," then she would just snap at me and say, "Obey the prophet," and get mad at me.
> But first, the purpose of giving her the money was that she said I owed the Lord 10 years of tithing and then she said, no, it was 12 years of tithing. And then she said I owed now on the net, on whatever the more is, the gross or the net, whichever is the one before taxes. She said I owe the money before taxes, not after. So after I gave her all this money, she said, "That's not enough because you didn't do it on the net," whichever the one is where you take the money out or there's no money taken out.[15]

Hughes could get cash advances on her credit cards, but she was worried she and her

husband—who did not know about these "donations"—would be unable to pay the

---

[13] RP (Jan. 5, 2015) at 79-80.
[14] RP (Jan. 5, 2015) at 63
[15] RP (Jan. 5, 2015) at 63.

minimal monthly payments.[16] Allen reassured Hughes by telling her an upcoming record deal would provide funds to pay her back:

> She told me that she was a recording artist and that she had a record deal coming up. I believe it was with Capitol Records. And she was going to get about $300,000 and she would give me $100,000 back as soon as that deal came through and that would cover—I was very concerned about the credit card monthly payments that would begin to come in, that we wouldn't be able to afford. And so she said, "Don't worry about it. My advance is coming really soon and I'll give you that money and, before your husband even knows the credit cards have been used, that money will be repaid to you."[17]

On June 28, Hughes took out cash advances on four credit cards and gave Allen $21,500, which Allen deposited in her Chase checking account the next day.

Allen did give Hughes some of the money. She told Hughes she would be her "ministry assistant" and paid her $500.[18] She promised to give Hughes $1000 per month and, in exchange, Hughes would have to complete "assignments" as the ministry assistant.[19] For example, the two women once went to a local IHOP and met a woman with a sick infant. Allen instructed Hughes to buy an outfit and a prayer blanket for the child. Allen planned to pray over the blanket so it would cure the child's illness. Allen did not give Hughes any more money.

Instead, Allen made various purchases using a debit card tied to the Chase account from July 9 through July 18. She spent nearly $4,000 on July 9 alone. The various purchases included an insurance bill and storage unit rent, but also retail purchases from Coach, Ross, Nordstrom, and Best Buy. She made two separate

---

[16] RP (Jan. 5, 2015) at 99.
[17] RP (Jan. 5, 2015) at 80.
[18] RP (Jan. 5, 2015) at 60.
[19] RP (Jan. 5, 2015) at 60.

withdrawals of $10,000 each on July 16 and 18. On July 18, she opened another account at Wells Fargo and deposited around $9,000.

On July 9, Allen met Hughes at IHOP again and informed her that, unfortunately, God was disappointed and required more money:

> [O]n the last night that I met her at the IHOP, [Allen] told me, "I hate to tell you this, but God just told me that you need to give more money, like, $12,000 approximately to atone for the sin of one of your ancestors who murdered somebody." Otherwise, my son would be killed.
> . . . .
> . . . [T]hroughout the whole process, she kept telling me, if I do this, then God will be pleased and then it'll be like, "I just prayed some more and, now, he told me you didn't tell the whole truth. And now you have to do this. And now he just told me something else and now you have to do this." And towards the end of that particular period of time, I began getting anxious, and suspicious, and frustrated.
> And it's like, all I wanted to do was obey God. And I couldn't understand why, every time I'd try to obey him, he'd change his mind, according to the prophet. . . And so then, when she said, "Now you have to come up with more money," I said, "I don't have any more money." And she said, "God told me you're clever. You'll be able to figure out how to get some more money."[20]

Hughes told Allen she could pay her another $14,000, but never did. That night, Hughes decided to do some research to see if Allen "actually was who she said she was."[21] Hughes's research led her to question some of Allen's claims.

The next day, July 10, Hughes called the police. After speaking with Hughes, police suspected Allen of extortion and theft. On July 11, police arrested Allen at the motel she was staying in. Allen gave a lengthy interview. She claimed to be a music writer with a "lucrative salary" as well as a minister.[22] Allen admitted to taking Hughes's money but told police it was for founding an outreach center. She told police the money

---

[20] RP (Jan. 5, 2015) at 72-73.
[21] RP (Jan. 5, 2015) at 77.
[22] Ex. 1.

would not be spent on anything other than securing a building and starting the outreach center. She claimed that none of the money had been spent, "not one penny."[23] She specifically denied buying the Jaguar with Hughes's money. She later admitted to buying the Jaguar with money from the Chase bank account she set up shortly after receiving money from Hughes.

Allen portrayed her alleged "outreach" venture as a cooperative effort between her and Hughes. Allen said that Hughes wanted to get involved with ministry work, so Allen invited Hughes to help her start a church:

> [Hughes] said she wanted to make a donation to the church. She said that. I have, I have a, you know what because I do work with business. I said are you sure you want to give any money to the church? I told her because I'm trying to find a center and I'm going to do it.[24]

Allen said that Hughes "want[ed] to help the vision" that she had "for a help center" "to do outreach."[25] Allen clarified: "except we're non profit."[26] She described the outreach center as something they planned to do together: "that's what we talked about, what are we going to [do], whether I'm going to buy a place or . . .," and "we need a church building . . . and we want to be more supportive of outreach here in our own city."[27] Allen later submitted a written statement that also suggested Hughes "had the same desires and wanted to help too."[28] Allen claimed that "Elizabeth [Hughes] said she was tired of being un-involved."[29] Hughes "wanted to do outreach to help people with me."[30]

---

[23] Pretrial Ex. 3 at 52, 54.
[24] Pretrial Ex. 3 at 13.
[25] Pretrial Ex. 3 at 15.
[26] Pretrial Ex. 3 at 15 (emphasis added).
[27] Ex. 1.
[28] Ex. 22.
[29] Ex. 22.

Over the next few weeks, Allen continued to make large withdrawals from the various bank accounts. She also continued to contact police and sent them written statements. In one statement she claimed to be organizing an outreach center and that she knew many important church leaders. She denied threatening Hughes or stealing money from her. She insisted Hughes "was sincerely devoted to this vision."[31] She left a lengthy voicemail claiming Hughes had "changed her mind," and that "we're just trying to get something started."[32] In another meeting with police, she described her bank account as "the money that we had, me and Elizabeth [Hughes]."[33] By August 16, the original Chase bank account Allen set up was down to $360.93. Police never recovered any of Hughes's money.

The State charged Allen on one count of first degree theft in excess of $5,000 and one count of second degree perjury. At trial, Allen denied discussing tithing with Hughes. She denied telling Hughes that she wanted to set up a ministry. She claimed setting up the ministry was Hughes's idea. Allen claimed Hughes came to her one day, handed her a check, and said, "surprise."[34] She testified that Hughes "took it upon herself to make a blueprint"; she made the plan like "a personal representative would do for any person or a leader."[35]

The jury acquitted on the perjury charge, but concluded Allen was guilty of first degree theft with an aggravating factor of a major economic offense. The court

---

[30] Ex. 22.
[31] Ex. 5.
[32] Ex. 17.
[33] Ex. 16.
[34] RP (Jan. 7, 2015) at 28.
[35] RP (Jan. 7, 2015) at 143-44.

imposed a sentence of 90 days confinement with 30 days converted to community service and the remainder for eligible work release. It also ordered Allen to pay $77,030.41 in restitution.

Allen appeals.

ANALYSIS

I. Standard of Review

In a criminal prosecution, the State must prove each element of the charged crime beyond a reasonable doubt.[36] "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."[37] Credibility determinations are for the trier of fact and are not subject to review.[38] We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.[39]

---

[36] In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970).
[37] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (internal citations omitted).
[38] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).
[39] State v. Walton, 64 Wn. App. 410, 415–16, 824 P.2d 533 (1992).

II. Sufficiency of the Evidence for Alternative Means

Criminal defendants have a constitutional right to a unanimous jury verdict.[40] This right includes the right to unanimity on the means by which the defendant is found to have committed the crime.[41] When a crime may be committed by alternative means, a particularized expression of unanimity as to the means by which the defendant committed the crime is unnecessary if evidence is sufficient to support each of the alternative means submitted to the jury.[42]

Here, the State charged Allen with first degree theft under RCW 9A.56.030(1)(a), which prohibits a person from committing "theft" of "[p]roperty or services which exceed(s) five thousand dollars in value . . . ."[43] A separate statute provides two relevant definitions for "theft"

> (1) "Theft" means:
>
> (a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or
>
> (b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services . . . .[44]

A statute defines "exerts unauthorized control" to mean "[h]aving any property or services in one's possession, custody, or control *as partner*, to secrete, withhold, or appropriate the same to his or her use or to the use of any person other than the true owner or person entitled thereto, where the use is unauthorized by *the partnership*

---

[40] Const. art. I § 21.
[41] State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994).
[42] Ortega-Martinez, 124 Wn.2d at 707-08.
[43] RCW 9A.56.030(1)(a).
[44] RCW 9A.56.020(1)(a), (1)(b).

*agreement.*" RCW 9A.56.010(22)(c) (emphasis added). It also provides that "'by color or aid of deception' means that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services." RCW 9A.56.010(4).

The State submitted an instruction permitting the jury to convict Allen under either of these definitions, thereby establishing alternative means to find guilt beyond a reasonable doubt:

> To convict the defendant of the crime of theft in the first degree, as charged in count 1, each of the following four elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That during a time between June 3, 2012, and August 16, 2012, the defendant
>       (a) exerted unauthorized control over property of another; or
>       (b) by color or aid of deception, obtained control over
>             property of another;
>                   and
> (2) That the property exceeded $5000 in value;
> (3) That the defendant intended to deprive the other person of the property; and
> (4) That this act occurred in the State of Washington.[45]

The State provided additional instructions defining each alternative means consistent with RCW 9A.56.010(4) and (22)(c). Because the jury provided no particularized expression as to the means by which Allen committed the crime, we may affirm her conviction only if sufficient evidence supports both alternative means submitted to the jury.[46]

---

[45] Clerk's Papers (CP) at 33 (emphasis added).

[46] The State can avoid unanimity problems in alternative means cases by using a Petrich instruction or other means to clarify the jury's unanimity as to each alternative means it relies upon. See State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984)

1. Unauthorized control based on a partnership agreement

Allen argues the evidence was insufficient to prove that she exerted unauthorized control over the property of another because the State failed to prove she violated a partnership agreement.[47] Whether sufficient evidence supports Allen's conviction for exerting unauthorized control based on a partnership agreement depends on whether the term "partnership agreement" refers to a technical definition meaning an agreement to establish a for-profit business or a common usage definition meaning an agreement to jointly pursue common action.

Allen contends the term "partnership agreement" refers only to an agreement to engage in a for-profit business. She therefore concludes that her conviction is unsupported by sufficient evidence because the State failed to show that Allen and Hughes sought to create such a business. But nothing in the statute's plain language or legislative history suggests that the legislature intended to strictly limit the term "partnership agreement" to the technical definition Allen proposes.

When determining the meaning of a statute, "[t]he court's fundamental objective is to ascertain and carry out the legislature's intent."[48] The legislature is presumed to intend the plain meaning of its language.[49] "In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as 'the context of the statute in which that provision is found, related provisions, and the

---

overruled in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). The State failed to do so here.

[47] See CP at 36; RCW 9A.56.010(22)(c).
[48] In re Det. of Danforth, 173 Wn.2d 59, 67, 264 P.3d 783 (2011).
[49] State v. Gibson, 16 Wn. App. 119, 127, 553 P.2d 131 (1976).

statutory scheme as a whole."[50] "In criminal cases, fairness dictates that statutes should be literally and strictly construed and that courts should refrain from using possible strained interpretations."[51]

When a term is not defined by a statute, judicial opinion, or pattern jury instruction, courts employ the common understanding of the term rather than its technical definition.[52] To determine the ordinary meaning of a term, courts look to standard English language dictionaries.[53] Courts typically do not rely on a legal dictionary unless there is some indication the term should be given its technical meaning.[54] When "[t]here is no indication that the legislature intended to use the legal definition of the term . . . [r]eliance on a legal dictionary definition is . . . improper."[55]

The plain language of the term "partnership agreement" is not restricted to only for-profit businesses. The term includes mutual arrangements to pursue a common purpose. The dictionary defines "partnership" as "the fact or state of being a partner."[56] It defines "partner" as "one that shares in the possession or enjoyment of something with another," or, alternatively, "one that is associated in any action with another: Associate, Colleague."[57] Therefore, the plain, ordinary meaning of "partnership agreement" does not require that the arrangement be specifically for profit. The term simply refers to an agreement to associate for specific action.

---

[50] State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (quoting State v. Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)).
[51] State v. Garcia, 179 Wn.2d 828, 837, 318 P.3d 266 (2014).
[52] State v. Brown, 132 Wn.2d 529, 611, 940 P.2d 546 (1997).
[53] State v. Gonzales, 168 Wn.2d 256, 263, 226 P.3d 131 (2010).
[54] Prostov v. Dep't of Licensing, 186 Wn. App. 795, 806, 349 P.3d 874 (2015).
[55] Prostov, 186 Wn. App. at 806.
[56] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1648 (2002).
[57] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1648 (2002).

In support of her technical legal definition argument, Allen relies on Black's Law Dictionary, which defines "partnership" as a "voluntary association of two or more persons who jointly own and carry on a business for profit."[58] But the plain language of the statute does not reveal the legislature intended the term "partnership agreement" be given its technical meaning. Consistent with the broad dictionary plain meaning, "partnership agreement" includes joint activities undertaken whether or not for profit.

The State presented sufficient evidence to prove Allen and Hughes formed a "partnership agreement" within the term's common meaning—an agreement to associate for a common purpose. Allen convinced Hughes to give her money to build an outreach ministry. Though Hughes provided the money, she and Allen intended that they would jointly participate in its formation. Hughes testified that the money was for the ministry. Allen gave Hughes the position of "ministry assistant."[59] The "receipt" Allen and Hughes signed reflects the money was part of an agreement between the two women to form a ministry and engage in certain charitable pursuits.[60]

Allen indicated during her interview with police that the ministry was a joint venture she formed with Hughes. Allen said that Hughes "want[ed] to help the vision" that she had "for a help center" "to do outreach."[61] She described the outreach center as something they planned to do together: "that's what we talked about, what are we going to [do], whether I'm going to buy a place or . . .," and "we need a church building .

---

[58] BLACK'S LAW DICTIONARY 1295 (10th ed. 2014).
[59] RP (Jan. 5, 2015) at 60.
[60] Ex. 27; RP (Jan. 5, 2015) at 51-52.
[61] Pretrial Ex. 3 at 15.

. . and we want to be more supportive of outreach here in our own city."[62] Allen later submitted a written statement that also suggested Hughes "had the same desires and wanted to help too."[63] Allen claimed that "Elizabeth [Hughes] said she was tired of being un-involved."[64] Hughes "wanted to do outreach to help people with me."[65] Viewed in the light most favorable to the State, a rational trier of fact could have concluded that Allen and Hughes agreed to jointly form a ministry and engage in charitable activities.[66] Such a joint enterprise is a partnership agreement.

Allen contends that the legislature added the "partnership agreement" subsection to the criminal code to address theft only in for-profit business partnerships. In State v. Birch,[67] the court recognized that "a partner cannot be prosecuted for use of partnership property because the theft statute requires the theft to be property of another."[68] Because each partner has an undivided interest in all partnership property, it is not the "property of another."[69] The legislature amended the theft statute two years after Birch to include the "partnership" section at issue here. In Coria, our Supreme Court casually observed that the amendment was a response to Birch.[70] Nothing in the statute's language or legislative history indicates the amendment was limited to a "partnership agreement" of a for-profit business or to the holding in Birch. The legislature could have

---

[62] Ex. 1.
[63] Ex. 22.
[64] Ex. 22.
[65] Ex. 22.
[66] Salinas, 119 Wn.2d 192, 201.
[67] State v. Birch, 36 Wn. App. 405, 675 P.2d 246 (1984).
[68] Birch, 36 Wn. App. at 408.
[69] Birch, 36 Wn. App. at 408.
[70] See State v. Coria 146 Wn.2d 631, 638, 48 P.3d 980 (2002) ("In response [to Birch] the legislature made it a crime for a partner to steal partnership property."); LAWS OF 1986, REG. SESS., ch. 257 § 2.

included a definition of "partnership agreement" limiting the term to its technical legal meaning, but it did not do so. Moreover, even if the amendment was primarily a response to Birch and the traditional exclusion of partnership property as "property of another,"[71] that does not mean the legislature did not also intend to extend this alternative means to theft of property being used in a joint non-profit activity. Allen offers no tenable policy reason to extend theft to embezzlement by for-profit business partners but not non-profit joint ventures.

Allen's reliance on definitions from the Uniform Partnership Act is also unpersuasive. The Act defines "partnership" as "an association of two or more persons to carry on as co-owners as a business for profit formed under RCW 25.05.055, predecessor law, or comparable law of another jurisdiction."[72] It also defines "partnership agreement" as "the agreement, whether written, oral, or implied, among the partners concerning the partnership, including amendments to the partnership agreement."[73] And the definitions section of the Act expressly declares that "[t]he definitions in this section apply throughout *this* chapter unless the context clearly requires otherwise."[74] Therefore, the legislature specifically intended that for purposes of the Act, "partnership" refers only to a legally formed partnership. But Allen provides

---

[71] See State v. Eberhart, 106 Wn. 222, 179 P. 853 (1919); Annot. Embezzlement, larceny, false pretenses, or allied criminal fraud committed by a partner. 82 ALR3d 822.
[72] RCW 25.05.005(6).
[73] RCW 25.05.005(7).
[74] RCW 25.05.005 (emphasis added).

no authority that the definitions under the Act applicable to that chapter also extend to the criminal code.[75]

Allen argues that even if "partnership agreement" includes the arrangement between her and Hughes, the receipt they signed did not specifically prevent Allen from spending the money on herself. She relies on State v. Joy.[76] In Joy, the defendant was a contractor who had entered into several contracts to remodel various homes.[77] The defendant received advance payments on the projects and failed to complete them.[78] The State charged the defendant with six counts of theft under an embezzlement theory, and the jury convicted the defendant on five counts.[79] The court reversed two of the convictions because "there was no testimony about what the parties agreed the money was to be used for, and the written contract does not restrict the use of the advance payments."[80] Allen contends that, like Joy, the receipt here does not restrict the use of the funds Hughes provided.

This argument fails. The receipt here did provide restrictions within the meaning of Joy. Hughes and Allen signed a "receipt" stating that Allen would use the funds "for outreach work, ministry building, church ministries, music publication, and helps."[81]

---

[75] See, e.g., State v. Veliz, 176 Wn.2d 849, 854 n.3, 298 P.3d 75 (2013) ("Though the term's 'permanent parenting plan' and 'temporary parenting plan' are defined in RCW 26.09.004(3) and (4), this statute states that the definitions 'apply throughout this chapter' signifying that the terms are not meant to define terms appearing in the criminal code.").

[76] State v. Joy, 121 Wn.2d 333, 851 P.2d 654 (1993).

[77] Joy, 121 Wn.2d at 335-38.

[78] Joy, 121 Wn.2d at 335-38.

[79] Joy, 121 Wn.2d at 335.

[80] Joy, 121 Wn.2d at 342.

[81] Ex. 27.

Allen then spent the money on a Jaguar and shopping trips to Ross, Coach, Nordstrom, and Best Buy.

The receipt here is more like the contracts involved in the counts the Joy court affirmed. When the defendant agreed to use an advance payment "to buy equipment and materials," or "to purchase windows," and then did something else with the money, the court held a jury could conclude the defendant violated the agreement. The receipt here indicated the funds would be used "for outreach work, ministry building, church ministries, music publication, and helps."[82] Like Joy, a jury could conclude that Allen's purchases violated this agreement.

Further, Allen incorrectly suggests that the agreement between Hughes and Allen is limited to the written receipt. In Joy, the court looked not only to written contracts but also testimony about what the parties understood regarding the purpose for the advance payments.[83] Here, the jury may properly consider the parties' testimony about the surrounding circumstances in addition to the written receipt to determine the scope of the agreement between Hughes and Allen. As discussed, the evidence supports the inference that both Allen and Hughes understood the money would be used for building the ministry. Hughes specifically testified she would not have given Allen that amount of money had she believed she would spend it on herself.

For the same reason, Allen's argument that her purchases did not violate the agreement also fail. She argues that she was "needy," and because the agreement permitted spending money to support the needy, her purchases did not violate the

---

[82] Ex. 27.
[83] Joy, 121 Wn.2d 335-38.

agreement. This argument ignores the standard of review for a sufficiency claim. We consider the evidence in the light most favorable to the State, not the light most favorable to Allen. We need only consider whether any rational jury could have found that Allen misused the funds under the agreement she had with Hughes. Viewed in a light most favorable to the State, there is sufficient evidence allowing a jury to conclude beyond a reasonable doubt that Allen's purchases violated their agreement.

## 2. By color or aid of deception

Allen argues the state failed to present sufficient evidence to demonstrate she committed theft "by color or aid of deception."[84] "By color or aid of deception" means "that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services."[85]

"'Deception' includes a broad range of conduct, including 'not only representations about past or existing facts, but also representations about future facts, inducement achieved by means other than conduct or words, and inducement achieved by creating a false impression even though particular statements or acts might not be false.'"[86] If the victim would not have parted with the property even if the true facts were known, there is no theft.[87]

The State presented ample evidence of deception here. Hughes testified that Allen presented herself as a well-known pastor and prophet. Allen claimed to communicate with God, and she told Hughes that God commanded she pay money to

---

[84] CP at 33.

[85] RCW 9A.56.010(4); see also CP 37 (Jury instruction 9).

[86] State v. Mehrabian, 175 Wn. App. 678, 700, 308 P.3d 660 (2013) (quoting State v. Casey, 81 Wn. App. 524, 528, 915 P.2d 587 (1996)).

[87] State v. Renhard, 71 Wn.2d 670, 672-74, 430 P.2d 557 (1967).

Allen. Allen consistently reminded Hughes that if she did not obey God or "the prophet," bad things would happen, including earthquakes and even harm to her children. [88] Allen also claimed to be a recording artist, and she promised to pay Hughes $100,000 after she received payment from an upcoming record deal.

When asked if she would have paid Allen $55,000 because she just "needed some help," Hughes responded "No, not that amount of money, no, sir."[89] Although this testimony suggests that Hughes would have given Allen some money, there is a reasonable inference she would not have given Allen her life savings. The jury only needed to find that Hughes would not have given Allen at least $5,001 had Hughes known the truth. Viewing the facts in the light most favorable to the State, sufficient evidence supports such a determination.

Allen's reliance on Renhard is mistaken. In Renhard, the defendant was the president of a corporation who asked the assistant secretary for two checks from the corporation.[90] The defendant claimed the checks were to pay for equipment, but he used them to pay for property he was purchasing for his own use.[91] The court held the State failed to prove deception because the secretary could not refuse to sign the checks and because the defendant could have obtained the checks even if he claimed he needed them for personal use.[92] Hughes specifically testified that she would not have given Allen such a large amount of money had she known the truth. Unlike Renhard, she was not required to give Allen money due to an employer-employee

---

[88] RP (Jan. 4, 2015) at 56-57.
[89] RP (Jan. 5, 2015) at 79-80.
[90] Renhard, 71 Wn.2d at 671.
[91] Renhard, 71 Wn.2d at 671.
[92] Renhard, 71 Wn.2d at 671-72.

relationship, nor could the funds be construed as a "salary."[93]  Sufficient evidence supports Allen's conviction for theft by deception.

## CONCLUSION

We conclude that "partnership agreement" under RCW 9A.56.010(22)(c) refers to the plain, ordinary meaning of a joint activity undertaken whether or not for profit.  Here, the State presented sufficient evidence to show that Allen violated a partnership agreement and that, but for Allen's deception, Hughes would not have given Allen her life savings.  Because sufficient evidence supports both alternative means, we affirm the judgment and sentence.

WE CONCUR:

---

[93] Renhard, 71 Wn.2d at 671-72.

-22-