IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | No. 85673-1-I |
| | |
| Respondent, | DIVISION ONE |
| | |
| v. | UNPUBLISHED OPINION |
| | |
| EMMANUEL GRANDEMARTINEZ, | |
| | |
| Appellant. | |

SMITH, C.J. — In 2023, the State charged Emmanuel Grandemartinez with assault in the second degree with a deadly weapon for his assault on a fellow inmate. After deliberating, the jury indicated they had reached a verdict but that they had filled out the verdict forms incorrectly. The court provided the jury with blank verdict forms to fill out and told them to review the instructions given the day before. The jury ultimately returned a verdict of guilty of assault in the second degree with a deadly weapon enhancement.

Grandemartinez appeals, asserting that insufficient evidence supports the jury's deadly weapon enhancement and that the trial court relied on improper communications with the jury in obtaining the special verdict. Grandemartinez also asserts ineffective assistance of counsel.

We affirm.

FACTS

Background

In June 2019, Emmanuel Grandemartinez was an inmate at Monroe Correctional Complex. Video surveillance and correctional officer testimony documented that, while in the day room, Grandemartinez walked up behind Majed and used a razor blade to cut across Majed's face in a slashing motion. Officers saw Majed abruptly stand up and hold his face while blood ran down his cheek.

As Majed and Grandemartinez walked toward them, the officers saw what appeared to be a bit of a razor blade in Grandemartinez's hand. Grandemartinez threw the blade backward before being handcuffed and subdued. Upon a search of the area, officers determined that Grandemartinez had disposed of "an improvised weapon" constructed out of the blade of a razor removed from the plastic handle and reassembled with tape. Pieces of the broken razor remained in Grandemartinez's room, as well as a toothbrush with a razor blade inserted into the handle. The razor, originally in one piece, had been provided by the Department of Corrections (DOC).

Physician's Assistant (PA) Ram Sharma treated Majed for his injuries. The laceration, which spanned from Majed's nose to his jaw, was about 11 centimeters in length. While the laceration started at a superficial depth at the base of the nose, it cut deeper into the edge of Majed's jaw. PA Sharma noted that the laceration cut into Majed's masseter muscle, which is "serious enough

that it could have done a lot of damage." Moreover, the cut could have injured a blood vessel, resulting in additional serious injury.

The State charged Grandemartinez with assault in the second degree with a deadly weapon.

### Motion to Dismiss Deadly Weapon Enhancement

At trial, following the close of evidence, Grandemartinez moved to dismiss the deadly weapon enhancement based on insufficient evidence. He asserted first that the razor blade did not constitute a per se deadly weapon under the statute because while the statute lists "a razor with an unguarded blade" as a deadly weapon, such a razor is a particular form of barber's razor, not simply a modified plastic razor. Grandemartinez provided a trial exhibit displaying a barber's razor as evidence that a "razor with an unguarded blade" is a specific intact tool, rather than simply any razor blade. He then argued in addition that that the State did not prove that the blade was used in a manner likely to produce death as required by the statute. Grandemartinez specifically noted the superficiality of the laceration.

The State opposed Grandemartinez's motion, stating "a razor with an unguarded blade is exactly what's before the Court." The State further argued that, as applied to the use prong of the enhancement, Grandemartinez used the potentially deadly instrument in a way that may easily produce death. Relying on PA Sharma's testimony, the State asserted that the downward swipe across Majed's face could have extended into the neck, which would have caused serious injury.

3

The court denied Grandemartinez's motion without addressing either party's per se deadly weapon argument. Rather, the court noted that, in the light most favorable to the State, the weapon "may easily and readily produce death." Grandemartinez did not take issue with the proposed deadly weapon jury instruction.

### Jury Instructions

At the close of trial, the court gave the jury three verdict forms: a general verdict form for assault in the second degree (verdict form A), a general verdict form for the lesser included offense of assault in the fourth degree (verdict form B) and a special verdict form for the deadly weapon enhancement. The court instructed the jury, "[i]f you find the defendant guilty on verdict form A, do not use verdict form B. If you find the defendant not guilty of the crime of Assault in the Second Degree, or if . . . you cannot agree on that crime, you will consider the lesser crime of Assault in the Fourth Degree [and] fill in the blank provided." As to the special verdict form, the court instructed the jury to fill in the blank with a "yes" or "no," but if not in agreement, to leave the answer blank.

### Verdict

Following deliberation, the jury returned, indicating that they had reached a verdict. The jury provided verdict form A marked as guilty as to the assault in the second degree, verdict form B marked as guilty as to assault in the fourth degree based on "having found the defendant not guilty of the crime of assault in the second degree as charged or being unable to unanimously agree as to that charge," and the special verdict form was left blank. The court then directed the

jury back to the deliberation room, informing the parties that the presiding juror indicated to the bailiff that the jury had filled out the forms incorrectly.

Noting the rarity of the circumstance, the court, State, and Grandemartinez agreed to poll the jury. The court asked each juror whether verdict form A was each juror's individual verdict and the verdict of the jury, to which each juror answered yes to both. The court also asked whether verdict form B was each juror's individual verdict and the verdict of the jury, to which each juror answered no to both. The court then dismissed the jury for the day. The court did not poll the jury about the special verdict form.

The following day, the parties agreed as to the case law applicable to the circumstance. But both parties objected to the court's suggestion that "the general idea is that we would send [the jury] back to fill out the jury forms and clearly indicate that they're not to deliberate any further." Concerned that the jury may interpret such a statement as the court directing jury action, the parties suggested that the court instruct the jury to follow the directions given the day before. The court did so and provided the jury with fresh verdict forms. The jury then returned with verdicts, finding Grandemartinez guilty of assault in the second degree, answering the special deadly weapon verdict form with a "yes" and leaving the fourth degree assault form blank.

### Sentencing and Appeal

The court sentenced Grandemartinez to a standard range sentence of 20 months for assault in the second degree and an additional 12 months for the deadly weapon enhancement.

5

Grandemartinez appeals.

## ANALYSIS

### Sufficient Evidence

Grandemartinez asserts that insufficient evidence exists to support the deadly weapon enhancement because a razor blade is not a per se deadly weapon under the enhancement statute or jury instructions and the State failed to prove that the blade, under the circumstances in which it was used, was capable of causing death. We disagree.

In reviewing a challenge to the sufficiency of evidence, we consider whether by "viewing the evidence 'in a light most favorable to the State, 'any rational trier of fact could have found the essential elements of [a] crime beyond a reasonable doubt.' " *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012) (internal quotation marks omitted) (quoting *State v. Randhawa*, 133 Wn.2d 67, 73, 941 P.2d 661 (1997)).

RCW 9.94A.825 defines a deadly weapon as "an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." The statute provides a list of per se deadly weapons, including "any razor with an unguarded blade." RCW 9.94A.825.

Grandemartinez contends that the razor blade does not qualify as a "razor with an unguarded blade" because the latter refers to a specific barber's tool and the taped razor blade that Grandemartinez used is not such an instrument, therefore it does not constitute a per se deadly weapon. The State disagrees,

stating that the modified razor blade fits the statutory definition as "any razor with an unguarded blade." We agree with the State.

We review questions of statutory interpretation de novo. *State v. Veliz*, 176 Wn.2d 849, 853-54, 298 P.3d 75 (2013).

If a statute's meaning is plain on its face, courts give effect to that plain meaning as the expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Nontechnical terms may be given their dictionary definitions. *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). But Washington courts have routinely recognized that the word "any" in a statute, even when undefined, is construed to mean "every" and "all." *State v. Smith*, 117 Wn.2d 263, 271, 814 P.2d 652 (1991). Further, the Washington State Supreme Court has interpreted the deadly weapon enhancement statute such that "it manifested no intent that any weapon which is in fact deadly should be excluded . . . [c]onsequently, the rule that criminal statutes are to be construed in favor of the defendant and the maxims of expressio unius est exclusio alterious,[1] and ejusdem generis[2] do not apply." *State v. Thompson*, 88 Wn.2d 546, 549, 564 P.2d 323 (1977).

---

[1] Expressio unius est exclusio alterious means " 'express mention of one implies exclusion of all others.' " *Glacier Nw., Inc. v. Dep't of Lab. & Indus.*, 32 Wn. App. 2d 189, 201, 555 P.3d 896 (2024) (quoting *Wash. State Lab. Council v. Reed*, 149 Wn.2d 48, 58, 65 P.3d 1203 (2003)).

[2] The maxim of ejusdem generis provides that when a general term follows a list of specific terms, the general term should be understood to include only items of the same type or class as those listed. *Willowbrook Farms LLP v. Dep't of Ecology*, 116 Wn. App. 392, 400-401, 66 P.3d 664 (2003).

Grandemartinez raises a handful of statutory interpretation arguments, contending that the dictionary definition of razor implies a specific instrument; that in reading the statute as a whole, the legislature clearly intended to include only that specific instrument; and that the doctrine of expressio unius est exclusio alterious highlights that the legislature could have included any razor and chose not to do so. But given that the dictionary definition does not provide the specificity that Grandemartinez suggests, the statute as a whole indicates that the legislature intended to include any razor with an exposed or unguarded blade, and the doctrine does not apply to this statute, we disagree.

The dictionary defines "razor" as "a keen-edged cutting instrument." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1888 (2002). Grandemartinez purports that this definition is consistent with his argument that "an unguarded blade" is a specific type of barber's razor, different than the average razor. And while it may be true than an unguarded blade is a specific type of razor, the dictionary definition also includes the general razor provided to Grandemartinez by DOC. In removing any guard and exposing the blade, Grandemartinez modified the average razor into "any razor with an unguarded blade." So, although a disposable razor that has not been modified may not qualify as a per se deadly weapon, the blade at issue does fit within the statutory definition.

Next, the statute lists "*any* razor with an unguarded blade" as a per se deadly weapon. RCW 9.94A.825. (Emphasis added.) Because we generally construe "any" to mean "any" and "every," the statutory language suggests a broader interpretation that Grandemartinez puts forward. In fact, the statute as a

8

whole leans toward inclusive language, following specific tools with a more generally sweeping "any other firearm" or "any knife having a blade longer than three inches." It would be inconsistent with the overall statute to draw a hard line here. And as the doctrine of expressio unius est exclusio alterious does not apply, we cannot infer that the inclusion of a specific tool results in the exclusion of the broader category.

Construing the evidence in the light most favorable to the State, the jury had sufficient evidence to find that the razor at issue constitutes a per se deadly weapon.

Because we conclude that sufficient evidence exists to consider Grandemartinez's razor a per se deadly weapon, we do not address whether the razor is a deadly weapon by use.

<u>Special Verdict</u>

Grandemartinez also contends that the trial court erroneously relied on improper communications between the bailiff and the jury which resulted in the deadly weapon enhancement special verdict. Accordingly, Grandemartinez asserts the enhancement should be vacated. The State maintains that the trial court did not rely on improper communications because nothing in the record suggests the communication with the jury would have altered their verdicts. We conclude that the trial court did not err in returning the jury to the jury room to correctly fill out the jury forms.

The Sixth Amendment and article I, sections 21 and 22 guarantee the right to a fair trial by an impartial jury. WASH. CONST. art. 1, §§ 21, 22; U.S. CONST.

9

Amend. 6. "The right to a fair and impartial jury trial demands that a judge not bring to bear coercive pressure upon the deliberations of a criminal jury." *State v. Boogaard*, 90 Wn.2d 733, 736-37, 585 P.2d 789 (1978). A claim of judicial intervention is a manifest constitutional error that may be reviewed for the first time on appeal. *State v. Ford*, 171 Wn.2d 185, 188-89, 250 P.3d 97 (2011).

1. Improper Communication

Grandemartinez asserts that, in relying on the jury's statement to the bailiff that they intended to fill out the special verdict form rather than the assault in the fourth degree verdict form, the trial court relied on an improper communication to impose the deadly weapon enhancement. We disagree.

As a general rule, a trial court should not communicate with the jury in the absence of the defendant. *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997). The bailiff is bound by the same constraint. *Bourgeois*, 133 Wn.2d at 407. Such an improper communication is an error of constitutional dimension. *Bourgeois*, 133 Wn.2d at 407.

To prevail on an improper communication claim, the defendant must demonstrate " 'a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention.' " *Ford*, 171 Wn. App. 2d at 188-89 (quoting *State v. Watkins*, 99 Wn.2d 166, 178, 660 P.2d 1117 (1983)). This requires an affirmative showing, not based on mere speculation, and must establish that the "jury was still within its deliberative process." *Ford*, 171 Wn. App. 2d at 189. The trial court is not permitted to consider or delve into the jury's deliberative process. *Ford*, 171 Wn. App. 2d at 191. Once the defendant raises

the possibility of intervention and resulting prejudice, "the State bears the burden of showing that the error was harmless beyond a reasonable doubt." *Bourgeois*, 133 Wn.2d at 407.

Procedurally, when the jury indicates it has reached a verdict, "[t]he jurors shall be asked by the court or the clerk whether they have agreed upon their verdict, and if the presiding juror answers in the affirmative, the presiding juror shall submit the verdict to the court." RCW 4.44.370. "After the verdict is announced, but before it is filed, the jury may be polled at the request of either party." RCW 4.44.390. If the poll indicates the jurors have not reached agreement, the jurors may be returned to the jury room for further deliberation or may be discharged. RCW 4.44.390; CrR 6.16(a)(3). If the jury is given special verdict forms and the special verdict is inconsistent with another special or general verdict, the court may direct the jurors to deliberate further or may order a new trial. CrR 6.16(b). "If the court determines that the verdict meets the requirements contained in this chapter and in court rules, the clerk shall file the verdict." RCW 4.44.460. However, before the jury has been discharged, the court has authority to direct the jury to correct errors apparent in the verdicts. *State v. Badda*, 68 Wn.2d 50, 61, 411 P.2d 411 (1966).

The court did not rely on an improper jury communication to return the jury to the jury room.

Following procedure, the presiding juror informed the court that the jury had agreed upon a verdict. The presiding juror then submitted the verdict forms to the court. When the trial court received the verdicts, the forms reflected

11

obvious error. In returning guilty verdicts on both assault charges, the jury contradicted the court's instructions. Because of the incompatibility, and the jury had not yet been discharged, the trial court acted appropriately in polling the jury to attempt to uncover the error. The jury then stated that the provided verdicts were not their actual verdicts.

Even without the specific statement of error from the jury, given the contradictory verdict forms and the jury responses unanimously indicating that the guilty verdict on the assault in the fourth degree charge was not their verdict, the court could not have known whether the special verdict form was appropriately left blank or whether that was also error. It was within the court's authority to return the jury to the jury room with all of the verdict forms to correct errors apparent in the verdicts.

Grandemartinez points to the presiding juror's communication with the bailiff expressing the error as an improper communication between the court and the jury. But the case law that Grandemartinez references applies to communications from the judge or the bailiff to the jury, not information coming in the other direction. Here, no evidence in the record shows that the bailiff or the court provided the jury with any additional or potentially coercive information.

Similarly, no evidence in the record establishes that the communication between the jury and the bailiff improperly influenced the jury's verdict. Rather, the opposite is true. The jury completed its deliberative process and then provided a verdict to the court. Once the verdict had been read, the jury

12

informed the court that it was incorrect, seeking to fix its own error. Neither the court nor the bailiff provided any information to the jury.

Grandemartinez also emphasizes the court's statement that "[h]ad we not just received the other information, my thought would have been: [the jury has] rendered verdicts. We can discharge them and we can deal with the issue of inconsistent verdicts. . . . But now we've just received a direct communication that they filled these out incorrectly." This, Grandemartinez suggests, indicates that the court should have simply discharged the jury. But the trial court's statements in that moment did not establish the only appropriate next steps in that circumstance. Because two of the three verdicts were facially incompatible, the court did not have a way to simply "deal with the issue." The court soon recognized the risk of error in all three verdict forms and appropriately returned the jury to the jury room.[3]

The court's communication with the jury when returning them to the jury room was not improper. After consulting with both defense counsel and the State, the court instructed the jury only to follow the directions given the day before. The jury returned their verdict within 11 minutes of their return to the jury room. No evidence in the record suggests that the court's instruction influenced the jury's verdict.

---

[3] Although the jury's comment to the bailiff may have caused the judge to consider a new way to proceed, that is irrelevant given that the new way was reasonable in these circumstances and there had been no inappropriate communication.

Because no improper communication occurred, no evidence exists of influence on the jury's verdict, and the jury had completed deliberations, the trial court did not err in returning the jury to the jury room to correct their verdict forms.

2. Remedy

Grandemartinez next asserts that, given the improper communication, the only lawful remedy is vacation of the deadly weapons enhancement without the possibility of further proceedings. The State disagrees, stating that case law permits the trial court to convene a jury for consideration of a special verdict on remand, notwithstanding the fact that the statute does not contain independent language authorizing such empanelment. Because no improper communication occurred, we decline to reach this issue.

3. Ineffective Assistance of Counsel

Lastly, Grandemartinez contends that defense counsel provided ineffective assistance of counsel both in allowing the court to rely on the jury communication and letting the jury correct their verdict. Because no improper communication occurred, defense counsel reasonably researched the complicated situation, and no resulting prejudice happened, we conclude no ineffective assistance of counsel took place.

We review ineffective assistance of counsel claims de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Estes*, 188

Wn.2d at 457. The duty to provide effective assistance includes the duty to research relevant legal authorities. *Estes*, 188 Wn.2d at 460.

To prevail on an ineffective assistance claim, the defendant must establish that (1) counsel's performance was deficient, and (2) that deficiency resulted in prejudice. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "Failing to conduct research falls below an objective standard of reasonableness where the matter is at the heart of the case." *Estes*, 188 Wn.2d at 460. But, "when counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

To show prejudice, the appellant must show a " 'reasonable probability' " that but for the deficient performance, the outcome of the proceedings would have been different. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). The presumption is strong that representation was effective. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

Grandemartinez contends that counsel was deficient in failing to advance the arguments he now raises on appeal. But Grandemartinez fails to establish deficient performance or resulting prejudice.

Grandemartinez alleges that defense counsel failed to research the relevant law governing the return of the verdicts and, therefore, fell below an

15

objective standard of reasonableness. But when presented with a notably rare, if not novel, circumstance, the record displays that defense counsel carried out their duty to research the relevant law. When first presented with the issue, defense counsel acknowledged that they were not sure how to proceed. But given time to research by the court, they returned with a greater understanding. The fact that defense counsel agreed with the State's recitation of the law does not mean that they failed to adequately research the issue themselves. Similarly, the fact that defense counsel did not raise the issues that Grandemartinez now asserts does not mean that their representation fell below the standard of care. A legitimate trial strategy is not deficient performance. Given the lack of case law on the issue and the circumstances under which the jury communicated with the bailiff, defense counsel had no reason to believe that the court could have simply accepted the obviously improper verdicts.

Because we conclude that defense counsel's performance was not deficient, we do not address prejudice. Grandemartinez was not subject to ineffective assistance of counsel.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____          _____
Chung, J.                                        Bowman, J.